WICKER, J.
11 This litigation arises out of a custody dispute between a biological mother, Paula[1] and her former partner, Vincent[2], who is biologically a female but identifies as a male. In this appeal, Vincent seeks review of the trial court’s denial of his petition for custody of the minor children, conceived through artificial insemination during the parties’ relationship. The trial court determined that Vincent, as neither the children’s biological nor legal parent, failed to meet his burden to prove that the granting of sole custody to Paula would result in substantial harm to the children, as required under La. C.C. art. 133.
For the following reasons, we find that, under the unique set of facts presented in this case, the trial court abused its discretion in denying Vincent’s request for a court-appointed evaluator to assist in the custody determination as contemplated under La. R.S. 9:331. Accordingly, we vacate the judgment of the trial court as it relates to the denial of Vincent’s petition for custody and remand this matter to the trial court for the purpose of appointing a mental health evaluator pursuant to La. R.S. 9:331 to perform a comprehensive custody evaluation.
Additionally, in this appeal, Vincent seeks review of the issuance of a protective order against him. The protective order prohibits Vincent from contacting Paula, as well as the minor children until they reach the age of eighteen. For the following reasons, we affirm the protective order as it relates to Paula. However, because we find there are no allegations of physical abuse against the children and, importantly, in light of our holding herein to vacate the denial of Vincent’s petition for custody, we vacate the protective order as it relates to the minor children.
*914 lain this opinion, we address the assignments of error relating to the denial- of Vincent’s petition for custody and the granting of Paula’s petition for protective order separately. . ;
CUSTODY JUDGMENT

Factual and Procedural Background

On February 26, 2014, Vincent filed a “Petition for Custody, Child Support, and Evaluations,” seeking sole custody of the minor children or, alternatively, joint custody, with Vincent designated as domiciliary parent. In his original petition, Vincent sought sole custody alleging that he was the primary caregiver for the children and that, “[sjince May 2012 Petitioner has been having physical custody of the minor children with the mother rarely see [sic] the children.” On March 7, 2014, Paula filed an Exception of No Cause/No Right of Action, asserting that Vincent lacked standing to seek custody under La. C.C. art. 132 because he is neither a biological nor legal parent and, further, that his petition failed to state a cause of action because the facts alleged were insufficient to show substantial harm, as required to grant custody to a non-parent under La. C.C. art. 133.
■ On March 11, 2014, the parties appeared for a hearing and entered into a Consent Judgment. Concerning Vincent’s petition for custody, the parties agreed that Vincent would be granted visitation with the children on the third weekend of every month, from Friday afternoon after school until Monday morning.[3]- On April 30, 2014, the parties appeared before the Domestic Commissioner, who ^granted Paula’s exception of no cause of action, but allowed Vincent the , opportunity to amend his petition to state a cause of action.[4]
Vincent timely filed an amended and supplemental petition, seeking sole custody of the children. In his-supplemental petition, Vincent again alleged that he was the children’s primary caregiver and that by May 2012, Paula “indicated that she was no longer interested in frequent , or regular contact with the minor children and left Petitioner with the exclusive care, custody, and control of the minor children.” The supplemental petition further asserted that Paula “abandoned” the children and that the children would suffer substantial harm, as contemplated under La. C.C. art. 133, should she be granted sole custody.
On December 10, 2014, Vincent filed various motions, .including a motion requesting the court to appoint a mental health evaluator and to set a hearing date for the custody trial. The transcript from a January 26, 2016 hearing before the Domestic Commissioner reflects that the court informed Vincent he would be permitted to retain an expert at his cost and that Paula would be required to make the children available to meet with any expert Vincent selected. The transcript further reflects that the Domestic Commissioner verbally informed the parties at some point during the hearing that he was “not going to order an evaluation” pursuant to *915 La. R.S. 9:331 at that time. A written judgment, signed March 9, 2015, states that the hearing on Vincent’s request for a court-appointed evaluator, in addition to other matters, was continued and reset to March 24, 2015.[5] |4The record reflects that a hearing did not take place on March 24, 2015,[6]
On June 26,'2015, the parties appeared before the Hearing Officer for a custody hearing. Oh that date, the Hearing Officer found that, “[d]ue to the unusual facts and relationship(s) of the litigants and these two (2) children these [sic] case will require a trial before the [district] judge.” The entire custody matter was transferred to the district judge and proceeded to trial on September 9, 2015.
At the custody trial, Vincent testified that he and Paula began dating in the year 2000. In April, 2003, Paula and Vincent participated in a ceremony in Tennessee, in which they together exchanged vows and “wedding rings.”[7] In 2005, Paula filed paperwork to have her last name legally changed in order to share the same last name as Vincent.
Vincent testified that, following Hurricane Katrina, he and Paula agreed to start a family and sought fertility treatment to have: a child.[8]- At the time of Hurricane Katrina, Vincent owned a construction business that was “booming,” thus making *916 the cost of fertility treatment less formidable. Vincent paid for Paula, who was not working at that time, to undergo in vitro fertilization treatment, which resulted in a pregnancy. On July 5, 2007, Paula gave birth to twins, Caitlin and Vincent, II.[9] Vincent was present at the hospital for the children’s birth. He testified that he and Paula, both sharing the same last name and wearing wedding bands at the time, represented themselves as a married couple to the hospital staff. RHe and Paula each signed the children’s birth certificates, with Vincent signing as the children’s father.[10] Vincent testified that the female twin, Caitlin, was born a “well-baby” and was discharged from the hospital before her brother, Vincent, II, who was born weighing approximately 3 pounds and remained in the NICU for days. Vincent testified that, after Paula and Caitlin had been discharged from the hospital, he packaged and delivered breast milk to Vincent, II, in the NICU at the hospital three times each day.
After the birth of the twins, Vincent stayed home with Paula for approximately two months to help with the children while Paula recovered from an emergency C-section. At that time, they lived in a 2800 square foot home in Folsom. When Paula returned to work after the twins’ birth, Vincent worked from 6:00 a.m. until 2:00 p.m. daily, after which he returned home to remain with the children in the afternoon/evenings while Paula worked from 2:00 p.m. to 6:00 p.m. Vincent testified that the children referred to him as “Daddy.” In October, 2009, Paula and Vincent and the children moved to Metairie.
In 2011, the children began preschool. In order to register the children at a desirable school, Vincent arrived to J.C. Ellis School at 3:00 a.m. to stand in line for preschool registration to ensure the twins would each be accepted. When the children were accepted into J.C. Ellis School for preschool, the school wrote a letter, addressed only to Vincent, informing him that his children had been accepted into the preschool program.[11] Vincent testified that he and Paula shared parenting responsibilities while the children were in preschool.
In November of 2011, Vincent remained at home with the children for a weekend while Paula visited her two children from a previous relationship, who 1 Jived with their father 200 miles away.[12] Vincent testified that his relationship with Paula became strained after he discovered that Paula cheated on him that weekend with a high school boyfriend with whom she had reconnected on Facebook. He testified that Paula moved out of the home on January 28, 2012, when the children were aged 4, into a one-bedroom apartment. He and the children remained in the home and.he and Paula shared physical custody of the chil *917 dren, rotating each 48 hours from January, 2012, through April, 2012. Vincent explained that, in April of 2012, Paula began expressing frustration with the children and complained that the children viewed her as a “babysitter.” Vincent testified that Vincent, II, was born, a “tiny baby”. and suffers from cognitive developmental delays, which he stated Paula has difficulty handling.[13]
Vincent testified that Paula began dating Robert, her current husband, in September, 2012, and that between September, 2012 and February 21, 2014, Vincent was the children’s primary provider and caregiver.[14] He testified that, during that seventeen-month period, Caitlin slept at Paula’s apartment on six occasions and Vincent, II, on four occasions. He further testified that Paula provided no financial support for the children’s clothing, food, school supplies, or medical care during that time period. He testified that Paula essentially “walked away” from the children during that time period, visiting with them approximately three hours per month.
|7On February 21, 2014, Vincent dropped the children off at school in the morning, as was his usual routine. That afternoon, Vincent received an email from Paula informing him that she had removed his name from the children’s birth certificates and changed the children’s last names. Through her email, Paula also instructed Vincent never to contact her or her family and threatened that, if he attempted to contact the children, she would contact the police.[15] Vincent testified that he contacted an attorney and within days filed a petition for .custody. He testified that the last time he saw the children was in July 2015, when the children were.aged 8, and that the children at that time still called him “Daddy.” .
Vincent retained Dr. Marianne Walsh, accepted as an expert in psychology, who testified that she met with the twins, then nine years old, on one date, April 20, 2015, for a consultation ahd evaluation. She met with each child for one hour and then met with Vincent separately for one hour and Vincent and the children together for approximately 45 minutes. Dr. Walsh testified that she did not perform a “full, comprehensive evaluation.” She further stated that she offered to meet with Paula separately and/or with the children, but that Paula never made herself available for consultation. She did not interview or evaluate Robert or any other individual involved in the children’s lives.
*918 Dr. Walsh testified that each child referred to Vincent as his or her father during the evaluation. She first met with Vincent, II, alone. She conducted an independent play activity with him, wherein a child selects which toy(s) he/she would like to play with from a variety of options in the office. Dr. Walsh stated that Vincent, II,- immediately selected the dollhouses and “set up two houses with play people and designated one house as his mother’s house and - one house as his father’s house...,” Vincent, II, told Dr. Walsh that he is sometimes scared at his mother’s house, relaying a story about a clown Robert talks about that “eats |schildren.” Vincent, II, further reported that there is a lot of “yelling” at his mother’s house and recalled an incident during which .he was yelled at for wetting the bed. Dr. Walsh testified that it can be normal for a child to be scared while in either parent’s care. Vincent,- II, told Dr. Walsh that when he is sad at his mother’s house, his stuffed dinosaur and his sister Caitlin make him feel better; when he is -sad at his father’s house, his father and Caitlin make him feel better. She testified that Vincent, II, told her that he misses his father and that his mother instructs-him to call Robert, “Daddy.”
Dr. Walsh met with Caitlin, who she described as very smart, mature, and cautious. Caitlin also was drawn to the dollhouses, but selected only one house to play with.. Dr, Walsh testified that Caitlin portrayed a mother and father arguing. She observed Caitlin holding the mother figure, who screamed at the father figure, “you fucking bitch,” and the father figure walked away. When questioned concerning this play, Caitlin revealed to Dr. Walsh that this incident took place between her mother, Paula, and her father, Vincent.
Dr. Walsh testified to her opinion that the children have a “secure bond” with their father,’Vincent. She further testified that if Vincent did not have regular contact with the children, they would suffer “emotional problems.” Dr. Walsh opined that, “[tjhis healthy relationship with their father is crucial to their psychological and emotional well-being; And his constant daily presence in their lives is- also vital to their well-being.”
Following this testimony, Paula moved for an- involuntary dismissal of Vincent’s petition for custody, asserting that he failed to prove substantial harm as required under La. C.C. art. 133. The trial judge agreed arid dismissed Vincent’s petition for custody. In his reasons for judgment, the trial judge found that Vincent is neither the- biological nor legal parent' of the minor children. Applying La. C.C. art. 133, the trial judge found that Vincent failed to prove that - Paula ' is “unable, launfit, neglectful, abusive, unwilling, or that she abandoned her rights” to justify the court’s interference with Paula’s constitutional right, to parent her - biological children. Thus, the trial judge found that Vincent failed “to meet the burden of proving by clear and convincing evidence that substantial harm will result to the children if custody is not changed to C. Vincent [ ].”

Law,and Analysis

I. Louisiana Law: The Burden in a Custody Dispute Between a Parent and Non-parent
In this case, because Vincent is neither the biological nor the legal parent of the children, he is considered a non-parent under Loriisiana law.[16] Custody contests *919 involving a parent and non-parent present the confluence of two powerful and basic principles: the child’s substantive right, to live in a custodial arrangement which will serve his or her best- interest and a parent’s constitutional right, to parent his or her biological child,
The interest of a parent in having a relationship with his children is manifestly a liberty interest protected by the Fourteenth Amendment’s due process guarantee. See Troxel v. Granville, 530 U.S. 57, 84, 120 S.Ct. 2054, 2070, 147 L.Ed.2d 49 (2000). The United States Supreme Court has declared it “plain beyond the need for multiple citation” that a biological parent’s right to “the companionship, care, custody, and management" of his children is a liberty interest far more important than .any property right. Trade F. v. Francisco D., 15-1812 (La. 03/15/16), 188 So.3d 231, 234; In re Adoption of B.G.S., 556 So.2d 545 (La. 1990) (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and Lassiter v. Department of Social Services of Durham County, N.C., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)).
However, that right is not unconditional. Further, while the child’s right to a custodial arrangement which promotes his or her best interest arises at birth, parents acquire the substantial protection of their interest in a child’s custody under the Due Process Clause by demonstrating a full commitment to the responsibilities of parenthood by “ ‘[coming] forward to participate in the rearing of his child.’ ” Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (quoting Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)). Each child custody case must be viewed , in light of its own particular set of facts-and circumstances,; and-courts must consider the “overarching and overriding concern for the best interest of the- child as well as the parent’s concomitant rights and responsibilities.” Tracie F. v. Francisco D., 174 So.3d 781, 796 (La.App. 9/21/15); See also McCormic v. Rider, 27 So.3d 277, 279 (La. 2/12/10).
1 Louisiana Civil Code Article 133 governs a custody dispute between a parent and a non-parent. La. C.C. art. 133 provides:
If an award of joint custody or of sole custody" to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to aiiy other person able to provide an adequate and stable, environment.
The Louisiana Circuit Courts of Appeal have determined that La, C.C. art. 133 requires a dual-prong test." This Circuit has set forth the burden a non-parent in a custody contest must meet under La. C.C. art. 133 as follows:
In .a conflict between a parent and a non-parent, the parent enjoys the para *920 mount right to custody of a child and may be deprived of such right only for compelling reasons. Whitman v. Williams, 08-1133, p. 2 (La.App. 3 Cir. 2/4/09), 6 So.3d 852, 853; Martin v. Dupont, 32,490, p. 6 (La.App. 2 Cir. 12/8/99), 748 So.2d 574, 578. The test to determine whether to deprive a legal parent of custody is a dual-pronged test: first, the trial court must determine that an award of custody to the parent would cause substantial harm to the child; if so, then the courts look at the “best interest of the child” factors to 11 determine if an award of custody to the non-parent is required to serve the best interest of the child. Black v. Simms, 08-1465, p. 4 (La.App. 3 Cir. 6/10/09), 12 So.3d 1140, 1143.
Duplessy v. Duplessy, 12-69 (La.App. 5 Cir. 06/28/12), 102 So.3d 209, 212-13.
Thus, a non-parent seeking custody under La. C.C. art. 133 must show that an award of joint custody or sole custody to the parent would result in substantial harm to the child. A showing of substantial harm “includes parental unfitness, neglect, abuse, abandonment of rights, and is broad enough to include ‘any other circumstances, such as prolonged separation of the child from its natural parents, that would cause the child to suffer substantial harm.’” Ramirez v. Ramirez, 13-166 (La.App. 5 Cir. 08/27/13), 124 So.3d 8, 17. Under the current jurisprudence applying the “dual-prong” test of La. C.C. art. 133, the best interest of the child and, specifically, the factors set forth in La. C.C. art. 134[17], are not considered until after a finding of substantial harm. See Duplessy, supra.
In a recent opinion, the Louisiana Supreme Court reiterated that “the overarching inquiry” in any custody contest is “the best interest of the child.” Tracie F. v. Francisco D., 188 So.3d at 235. The Court emphasized that the best interest of the child is the paramount goal in all custody determinations, including contests between a biological parent and a non-parent. The Court stated:
1 ^According to 1993 Revision Comment (a), “the best interest of the child [is] the overriding test to be applied in all child custody determinations. The primacy of that test has been statutorily mandated in Louisiana since 1979 (C.C. Arts. 134, 131(A) (1992); Acts 1979, No. 718), and *921 the best interest principle itself has been jurisprudentially and legislatively recognized at least since 1921.” (Emphasis added.) Leaving no room for doubt that the best interest of the child is the test for “all child custody determinations,” (La. C.C. art. 131, 1993 Revision Comment (a)), a later comment to Article 131 stresses that “[t]his Article should be followed in actions to change custody as well as in those to initially set it.” La. C.C. art. 131,1993 Revision Comment(d) (emphasis added). Similarly, the comments to La. C.C. art. 134, which lists factors for determining the best interest of the child, indicates: “Article [134] should be followed in actions to change custody, as well as in those to fix it initially.” La. C.C. art. 134, 1993 Revision Comment (d) (emphasis added). Tracie F. v. Fransisco D., supra, at 238-39.
The Louisiana Supreme Court has not considered a custody dispute factually similar to this case, where the non-parent is neither biologically nor legally related to the child but has, in essence—together with the biological parent—parented the child in a, albeit non-traditional, family unit since the child’s birth. The dynamics of the American family, however; have drastically changed. The United States Supreme Court has recognized that “the demographic changes in the past century make it difficult to speak of an average American family.” Troxel, supra at 63, 120 S.Ct. 2054. For example, same-sex couples are raising more than two million children in the United States.[18] Further, no Louisiana court has opined on any same-sex custody dispute since the United States Supreme Court’s landmark decision in Obergefell, wherein the Court held that “the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty.” Moreover, in Obergefell, the United States Supreme Court opined that the decision to start a family falls within that fundamental right inherent in the liberty interest of the person to marriage. The Court recognized that |1s“[t]he marriage laws at issue here thus harm and humiliate the children of same-sex couples.” Id.[19]
*922 In light of the‘Supreme Court’s recent emphasis’in Tracie F. v. Fransisco D. that the best interest of the child is the principal consideration in all child custody determinations, including ■ initial custody contests between parents and ' non-parents, however, the legal question arises—-may a trial judge rule on whether a non-parent has , met his burden of proving substantial harm under La. C.C. art. 133 without also considering the best interest of the child; as provided in La. C.C, art. 134?
Because neither the Louisiana Supreme Court nor this Court has opined on the applicable burden in a custody contest between a' parent' and a non-parent involved in a same-séx relationship—where the non-parent has intentionally parented the child as a second parent in a'family unit with the biological parent since the child’s birth and, in light of the United State Supreme Court’s decision in Obergefell—we consider the other Southern States’ statutory and jurisprudential analysis.
II. Other Southern States
Generally, in all states, a non-parent third party seeking custody or visitation rights bears the burden of proof, and the best interest of the child is the predominant factor in the courts’ determination. See e.g. Troxel v. Granville, 530 U.S. 57, 84, 120 S.Ct. 2054, 2070, 147 L.Ed.2d 49 (2000). As discussed below in | ua state-by-state analysis, the standard differs in each state, and in some respects, depends upon the conduct and intent of the natural parent in, regards to the non-parent’s relationship with the child.
States like. Kentucky and Oklahoma have distinguished a traditional non-parent—for example, a grandparent or a stepparent—from a non-parent who. the natural parent intended from the child’s birth or adoption to be a- second parent to the child. See e.g. Ramey v. Sutton, 2015 OK 79, 362 P.3d 217, 221 (Okla. 2015) (holding that a biological mother’s former same-sex partner had standing to seek custody and visitation under the Uniform Custody Jurisdiction and Enforcement Act, where the couple had not had the opportunity to take advantage of the legal protections of mar-riagé before their relationship ended, the non-parent partner had been intimately involved in the conception, birth, and parenting of the child at the biological mother’s request, and the biological mother and the non-parent partner had made a conscious decision to have a child and ‘ co-parent as a family), and Mullins v. Picklesimer, 317 S.W.3d 569 (Ky. 2010) (finding that a mother waived her superior right as natural parent to sole custody of a child in favor of a joint custody arrangement with her same-sex non-parent partner, and thus the non-parent partner was entitled to shared custody of the child following dissolution of the relationship between the mother and her partner, where the mother and the partner had jointly decided to start a family, a sperm donor had been selected based in part on the non-parent partner’s characteristics, the partner had cared for the child from birth until after dissolution of the parties’ relationship, and the mother had encouraged; fostered, and facilitated an emotional and psychological bond between the non-parent partner and the child).
Further, states such as Mississippi have opined that parentage should not be limited to biology. See Griffith v. Pell, 881 So.2d 184 (Miss. 2004) (finding that the ex-husband had standing to seek custody and/or visitation of a child born j1fibefore the marriage, where the ex-husband had *923 acted in loco parentis by assuming status and obligations of a parent before and during the marriage).
Many of the southern states have utilized the in loco parentis, psychological parent, or de facto parent doctrines to recognize the bond formed between a child and a legal non-parent. The application of these doctrines provides for a more nuanced analysis than traditional approaches to custody disputes by allowing the court to consider the best interest of the child in light of the current realities of the changing demographics of American families.
Although the definition varies from state to state, the doctrine of in loco parentis is generally applied where a non-parent has assumed a large portion of caretaking responsibilities that are typical of a natural parent. See e.g. Ramey v. Sutton, supra; Bethany v. Jones, 2011 Ark. 67, 378 S.W.3d 731, 741 (2011); Davis v. Vaughn, 126 So.3d 33, 38 (Miss. 2013); Mason v. Dwinnell, 190 N.C.App. 209, 660 S.E.2d 58, 71 (2008). A non-parent acting in loco parentis is an individual “acting as a temporary guardian or caretaker of the child, taking on all or some of the responsibilities of a parent.” In loco parentis, Black’s Law Dictionary (10th ed. 2014). As discussed below, however, m loco parentis status is a temporary doctrine and, in some states, may be revoked unilaterally by the biological or legal parent.
The psychological parent doctrine, developed by the Wisconsin . Supreme Court in In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419 (1995), utilizes a four-prong test to determine whether a non-parent, who has become a psychological parent to the child, may obtain custody or visitation rights. The purpose is to ensure that the non-parent’s relationship with the child is not severed at the expense of the child’s well-being, while concomitantly limiting a non-parent’s eligibility for psychological parent status. See Marquez v. Caudill, 376 S.C. 229, 656 S.E.2d 737 (S.C. 2008); Mason v. Dwinnell, 190 N.C.App. 209, 660 S.E.2d 58, 71 (2008); Griffith v. Pell, supra.
The doctrine of de facto parental status has also been applied in determining visitation or custody disputes. In some states, under this doctrine, a non-parent .is required to prove by clear and convincing evidence that he or she resided with the child for a certain period of time and was the child’s primary caregiver and financial supporter. See e.g. S.C. Code Ann. § 63-15-60; Ky. Rev. Stat. Ann. § 403.270. Unlike in loco parentis -or a psychological parent, a person seeking to establish de facto status, in- some states, must prove that he or she was the primary caregiver as opposed to a co-parent, See e.g. S.C. Code Ann. § 63-15-60 (2008). Notably, though, in some states' the terms in loco parentis, psychological parent, and de fac-to parent are used interchangeably, and a de facto parent need not prove the “primary” caregiver requirement. See Mason v. Dwinnell, 190 N.C.App. 209, 660 S.E.2d 58, 71 (2008) (wherein the court found that a former domestic partner of a biological parent was an in loco parentis or de facto parent and had formed- a psychological parenting relationship with the child conceived by artificial insemination during the period of the domestic partnership).
•Interestingly, with the exception of Virginia and Florida, states that have not adopted a more malleable standard in determining whether a non-parent same-sex partner has standing to seek custody or visitation, have either not had a factually similar case or have not opined on the issue since the United States Supreme Court’s decision in Obergefell v. Hodges, — U.S. —, 135 S.Ct. 2584, 2589, 192 L.Ed.2d 609 (2015). The following provides a state-by-state analysis of the law and *924 jurisprudence in the other southern states regarding the unique child custody and visitation issues presented in this case.
| Alabama
In a custody contest between a parent and' a non-parent, the parent has a prima facie right to custody of his or her child, unless the court finds by clear and convincing evidence that the parent is unfit. Ex parte N.L.R., 863 So.2d 1066, 1068-69 (Ala. 2003). This presumption does not apply, however, in a case in which the parent voluntarily forfeits his or her right to custody in favor of a non-parent or where there is a finding that the parent is unfit. Ex parte G.C., 924 So.2d 651, 656 (Ala. 2005). Alabama has not considered any custody contest similar to the facts presented in this case.
Alabama has recognized the in loco par-entis and the de facto parent doctrines; however, Alabama has never considered these doctrines in the context of a custody dispute. In Smith v. Smith, a tort action concerning whether the parental immunity doctrine applied to a non-parent under the facts of that case, the Alabama Supreme Court considered the in loco parentis doctrine, finding that a non-parent stands in loco parentis if he or she (1) assumes the obligations incident to parental status, without legally adopting the child, and (2) voluntarily performs the parental duties to generally provide for the child. Smith v. Smith, 922 So.2d 94 (Al. 2005). Further, Alabama jurisprudence has recognized a de facto parent relationship in the context of determining foster parent status after a child has been determined a “dependent child” under Alabama law. See A.E. v. M.C., 100 So.3d 587, 601 (Ala. Civ. App. 2012).
In Searcy v. Strange, 81 F.Supp.3d 1285, 1287 (S.D. Ala. 2015), a federal district court, applying Alabama law, considered the constitutionality of Alabama’s marriage and adoption laws, which prevented the partner, not biologically related to the child, to qualify as a “spouse” for adoption purposes. Id. The United States District Court found that the Alabama marriage law, preventing one partner to adopt the biological child of another partner, violated the Due Process Clause and |1sEqual Protection Clause of the Fourteenth Amendment to the United States Constitution. Id. In particular, the court discussed the unique implications that must be considered in custody determinations regarding children raised by same-sex partners to whom the law, at the time, afforded no legal option to marry:
If anything, Alabama’s prohibition of same-sex marriage detracts from its goal of promoting optimal environments for children. Those children currently being raised by same-sex parents in Alabama are just as worthy of protection and recognition by the State as are the children being raised by opposite-sex parents. Yet Alabama’s Sanctity laws harms the children of same-sex couples for the same reasons that the Supreme Court found that the Defense of Marriage Act harmed the children of same-sex couples. Such a law “humiliates [] thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.” [U.S. v.] Windsor [— U.S. —], 133 S.Ct. [2675] at 2694 [186 L.Ed.2d 808 (2013) ]. Alabama’s prohibition and non-recognition of same-sex marriage “also brings financial harm to children of same-sex couples.” Id. at 2695, because it denies the families of these children a panoply of benefits that the State and the federal government offer to families who are *925 legally wed. Additionally, these laws further injure[] those children of all couples who are themselves gay or lesbian, and who will grow up knowing that Alabama does not believe they are as capable of creating a family as their heterosexual friends.
Id. at 1290.
The repercussions of the holding in Searcy v. Strange have yet to be determined since Alabama has not considered a custody dispute involving same-sex partners since the United States Supreme Court’s decision in Obergefell, supra.[20]

Arkansas

Arkansas, on the other hand, has applied the doctrine of in loco parentis to custody and visitation disputes between a parent and a non-parent. Arkansas defines in loco parentis as “in place of a parent; instead of a parent; charged facti-tiously with a parent’s rights, duties, and. responsibilities.” Bethany, 378 S.W.3d 731, 737 (citing Robinson v. Ford-Robinson, 362 Ark. 232, 239-40, 208 S.W.3d 140 (Ark. 2005)). This doctrine examines “the relationship between the child and the person asserting that they stood in loco parentis.” Bethany, 378 S.W.3d at 737. A person has standing in loco parentis if that person “has fully put himself [or herself] in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations.” Daniel v. Spivey, 2012 Ark. 39, 386 S.W.3d 424, 428 (Ark. 2012). “The hallmark of the in loco parentis relationship is the assumption of the rights, duties, and responsibilities associated with being a parent.” Id. at 429. Arkansas has applied this doctrine to children raised by persons in same-sex relationships. Id.; See also Foust, 2015 Ark. 66, 456 S.W.3d 736.
The Arkansas Supreme Court analyzed the doctrine of in loco parentis in the context of a visitation dispute in Bethany v. Jones, supra. In Bethany, the biological mother of a minor child argued that her former same-sex partner, as neither the biological nor adoptive parent, was not entitled to visitation with the minor child. The biological mother and her same-sex partner were together from 2000 until 2008. In 2004, after the couple bought a home together, the couple decided to have a child. The biological mother became pregnant through artificial insemination and gave birth to the minor child in 2005. After the child was bom, the biological mother’s partner stayed home as the child’s primary caregiver. In 2008, the couple’s relationship ended. Although the couple originally agreed to co-parent the child during their separation, the biological mother eventually decided to keep the minor child away from her former partner. The mother’s former partner filed suit seeking visitation, which was ultimately granted. The Arkansas Supreme Court analyzed the relationship between the non-parent and the minor child, specifically finding that the non-parent acted as a stay-at-home parent for the first three years of the child’s life, the child called the non-parent “Mommy,” the child had a relationship with the non-parent’s parents and extended | ^family, and the parties originally planned to co-parent the child before the relationship deteriorated. On this basis, the court affirmed the circuit court’s *926 decision and found that the non-parent had standing in loco, parentis to seek visitation.
However, in 2015, the Arkansas Supreme Court again considered the in loco parentis doctrine and. determined that the relationship- is not perpetual. In Foust v. Montez-Torres, the court found that the in loco parentis relationship may be revoked “by either the person assuming parental duties or the child” at any time. 2015 Ark. 66 at *4, 456 S.W.3d 736, 738 (citing Babb v. Matlock, 340 Ark. 263, 267, 9 S.W.3d 508, 510 (2000)). Because the non-parent has the right to end the in loco parentis relationship, the Arkansas Supreme Court held that “the natural parent must also be perinitted to terminate the relationship at will, lest the law improperly prioritize the rights of the non-parent above that of the natural parent.” Foust, 456 S.W.3d 736, 738-39.
In Foust, a biological mother’s former same-sex "partner sought custody of a child conceived during their relationship. The couple’s relationship lasted from 1994 until 2009. In 2006, the mother had a brief relationship with a man, which resulted in the conception of the minor child. After the relationship deteriorated, the parties established a visitation schedule, which would allow the non-parent to see the minor child. After the parties separated, they established a visitation agreement, which the biological mother unilaterally ended in 2013. The Arkansas Supreme Court ultimately held that although the non-parent once had in loco parentis standing, the non-parent had lost that standing. Specifically, the court stated that a natural parent has the right to sever an in loco paren-tis relationship between his or her child and a non-parent. The court also found that the non-parent had not lived with the child for over three years, which meant that the non-parent could not stand in loco parentis. Thus, the court held that “a non-parent has |ai.no standing to petition for custody or visitation where the non-parent does not stand in loco parentis to the child at the time of the petition.” Id. at 740.
The dissent in Foust, authored by Justice Danielson, pointed out the problematic nature of this ruling. The dissent recognized that the majority’s holding “limit[s] the status of in loco parentis to situations in which the person seeking visitation remains in the home with the child.” Id. at 742. The dissent argued that the holding rendered the doctrine useless in custody disputes, which typically arise after a couple’s relationship has deteriorated and one person has moved out of the family home, and “raisefd] the question of why a person still residing in the home would ever need to assert in loco parentis status and obtain a court order allowing visitation.” According to the dissent, this would require a non-parent to “seek a preemptive order of visitation,” which is “nonsensical.” The dissent, opined that, by completely ignoring the Arkansas Supreme Court’s holding in Bethany, the majority “created an irreconcilable conflict in our law.” Id.
The ■ Arkansas Supreme Court’s decisions in Bethany and Foust do in fact pose “irreconcilable conflict” within Arkansas state law concerning application of the in loco parentis doctrine in same-sex custody disputes.

Florida

. The Florida Supreme Court has held that a non-parent cannot be granted the right to custody “absent evidence of a demonstrable harm to the child” because “such a grant unconstitutionally interferes with a natural parent’s privacy right to rear his or her child.” Beagle v. Beagle, 678 So.2d 1271 (Fla. 1996). Florida’s burden is similar to Louisiana’s burden that a non-parent seeking custody must show that sole or joint custody with the biologi *927 cal or legal parentwould result in substantial harm to the child.
However, in a recent Florida Supreme Court case, D.M.T. v. T.M.H., 129 So.3d 320, 338-39 (Fla. 2013), the court considered a same-sex couple’s custody dispute 122and held that both women were entitled to assert parental rights. In D.M.T., the biological mother of the child, who donated her egg to her same-sex partner, the birth mother, to undergo in vitro fertilization, fíled a petition to establish parental rights. The court found that the biological mother had standing to assert parental rights. The court further found that the birth mother, who actually carried and gave birth to the child, was also the child’s legal parent under Florida law. The Florida Supreme Court’s reasoning in its holding that both women had standing to establish parental rights could influence the definition of parentage and further raise constitutional implications arising out of the in vitro fertilization process. The court stated:
As explained by the Fifth District in this case, it is difficult to understand how rigid legal rules “established during a time so far removed in history when the science of in vitro fertilization was a remote thought in the minds of the scientists of the times [have] much currency today.” T.M.H. [v. D.M.T.], 79 So.3d [787] at 796 [ (Fla.Dist. Ct. App. 2011) ]. Although the right to procreate has long been described as “one of the basic civil rights” individuals hold, Skinner [v. State of Okl. ex rel. Williamson], 316 U.S. [535] at 541, 62 S.Ct. 1110 [86 L.Ed. 1655 (1942) ], advances in science and technology now provide innumerable ways for traditional and non-tradi.tional couples alike to conceive a child and, we conclude, in so doing to exercise their “inalienable rights ... to enjoy and defend life and liberty, [and] to pursue happiness.” Art. I, § 2, Fla. Const.; see Grissom [v. Dade County], 293 So.2d [59] at 62 [ (Fla. 1974) ].
[[Image here]]
We conclude that the State would be hard pressed to find a reason why a child would not be better off having two loving parents in her life, regardless of whether those parents are of the same sex, than she would by ¡having only one parent.
Id. at 338-39, 344.'
Subsequent' to the Florida’s Supreme Court’s decision in D.M.T., supra., however, the Florida Second District Court of Appeal, in Russell v. Pasik, 178 So.3d 55, 57-58 (Fla. Dist. Ct. App. 2015), held that the former same-sex partner of a biological mother did not have standing to petition for- timesharing with the children conceived through artificial insemination and born to the biological mother. The appellate court rejected the partner’s‘ claim- for standing as a 1 ^psychological or de facto parent. Thus, the appellate court interpreted the Florida Supreme Court’s holding in D.M.T.—that a biological parent, in addition to a legal parent, has standing to establish parental rights—to exclude ' a person, who is neither a biological nor legal parent but who has acted as a second parent, from establishing parental rights. How other Florida appellate courts decide this issue in light of the above quoted language from the Florida Supreme Court’s holding in D.M.T. and Russell v. Pasik, supra, remains to be seen.

.Georgia

Georgia courts have not addressed the particular factual situation before this Court. In Georgia, a limited class of persons, including grandparents, great-grandparents,- aunts, uncles, siblings, or adoptive parents, has standing to seek custody. Ga. Code Ann. § 19-7-1. In an initial custody dispute between a parent and a non-parent, the non-parent bears the bur *928 den of proving that the best interest of the child supports an award of custody to the non-parent. While the best interest of the child is the overriding consideration, there is a three-part rebuttable presumption that it is in the child’s best interest to remain in the custody of the parent: (1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child’s best interest is to be in the custody of a parent. Clark v. Wade, 273 Ga. 587, 544 S.E.2d 99, 103 (2001). To overcome the parental presumption, the non-parent must first prove, by clear and convincing evidence, that parental custody would harm the child; then, that an award of custody to the non-parent will best promote the child’s health, welfare and happiness. Id. at 108; Strickland v. Strickland, 298 Ga. 630, 783 S.E.2d 606 (2016). The harm that a third party relative must show to overcome the presumption in favor of a parent in a custody dispute is either “physical harm or significant, long-term emotional harm, not merely social or economic disadvantages.” Clark v. Wade, 544 S.E.2d at 107. Specifically, the Georgia Supreme Court, has found that in 1 ¡.¿determining whether a child would be harmed a variety of factors should be considered that “go beyond a parent’s biological connection or present fitness to encompass a child’s own needs,” including:
(1) who are the past and present caretakers of the child or children; (2) with whom has the child or children formed psychological bonds and how strong are these bonds; (3) have the competing parties evidenced interest in, and contact with, the child or children over time; and (4) are there any unique medical or psychological needs of the child or children.
Strickland v. Strickland, 783 S.E.2d at 608.[21]

Kentucky

Kentucky has addressed a factually similar custody dispute between same-sex partners, where one of the partners is the biological parent and the other is neither the child’s biological nor adoptive parent.
First, Kentucky provides a statutory scheme by which a non-parent may attain standing to seek custody or visitation if he or she qualifies as a de facto custodian. See Mullins v. Picklesimer, 317 S.W.3d 569, 578 (Ky. 2010), as modified on denial of reh’g (Aug. 26, 2010); Truman v. Lillard, 404 S.W.3d 863 (Ky. Ct. App. 2012); Ky. Rev. Stat. § 403.270.
Kentucky Revised Statute § 403.270(l)(a) defines a de facto custodian:
‘De facto custodian’ means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services.
In Kentucky, a court must give a de facto custodian, who is defined by statute as the child’s “primary caregiver,” the same standing in custody matters that is given to each legal parent. Ky. Rev. Stat. § 403.270; Ky. Rev. Stat. § 403.280; Ky. Rev. Stat. § 403.340; Ky. Rev. Stat. § 403.350; Ky. Rev. Stat. § 403.822; Ky. *929 Rev. Stat. § 405.020. If it is in the best interest of the child, joint custody to the child’s parents or to the child’s parents and a de facto custodian may be granted by the court. Ky. Rev. Stat. § 403.270(5). Ky. Rev. Stat. § 403.270(2) specifies the criterion to be weighed by the court:
The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent and to any de facto custodian. The court shall consider all relevant factors including: (a) The wishes of the child’s parent or parents, and any de facto custodian, as to his custody; (b) The wishes of the child as to his custodian; (c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child’s best interests; (d) The child’s adjustment to his home, school, and community; (e) The mental and physical health of all individuals involved; (f) Information, records, and evidence of domestic violence as defined in KRS 403.720; (g) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian; (h) The intent of the parent or parents in placing the child with a de facto custodian; and (i) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school.
Nevertheless, when a non-parent does not meet the statutory standard to be deemed a defacto custodian, the non-parent may still seek custody, but must prove: (1) that the parent is shown by clear and convincing evidence to be an unfit custodian, or (2) that the parent has waived his or her superior right to custody by clear and convincing evidence. Mullins v. Picklesimer, 317 S.W.3d at 578. A legal waiver has been defined as a “voluntary and intentional surrender or relinquishment of a known right, or ... advantage which the party at his option might have demanded or insisted upon.” Greathouse v. Shreve, 891 S.W.2d 387, 390 (Ky.1995) (quoting Barker v. Stearns Coal & Lumber Co., 291 Ky. 184, 163 S.W.2d 466, 470 (1942)). No formal or written waiver is required, however “statements and supporting circumstances must be equivalent to an express waiver to meet the 12r,burden of proof.” Vinson v. Sorrell, 136 S.W.3d 465, 469 (Ky. 2004)(quoting Greathouse, 891 S.W.2d at 390-91)).
The Kentucky Supreme Court, in Mullins v. Picklesimer, supra, found that even though a mother’s former same-sex partner had not been a de facto custodian of the child, because the same-sex couple had intentionally co-parented the child, the mother had waived her superior right as a natural parent. The court reasoned that:
[T]he child was conceived through artificial insemination and brought into the world upon agreement of the parties to parent the child together. It was undisputed that Mullins physically cared for and supervised [the child] from birth throughout the period the parties were together and for the five months there-. after when they shared custody. And she did so in the capacity of a parent, which is evidenced by her living as a family with the child and Picklesimer, the child calling her “momma,” the child’s hyphenated surname (Picklesimer-Mul-lins), the parties’ attempt to confer parental rights on Mullins with the agreed judgment of custody, and Picklesimer *930 continuing to- allow Mullins to co-parent to the child for some five months after the parties’ relationship dissolved. This would distinguish the monparent acting as a parent to the.child from a grandparent, a babysitter, or a boyfriend or girlfriend of the parent, who watched the child for the parent, but who was never intended by the parent to-be doing so in the capacity of another parent. Mullins v. Picklesimer, 317 S.W.3d at 576-77.
The court held that, unlike a de facto custodian, the waiver of the parent’s superior right to custody is not required to be exercised to the exclusion of the legal parent. In order to determine whether a natural parent has waived his or her superior right, to custody, the court in Mullins pronounced that there can be a waiver of some part of custody rights when an intent to co-parent a child with a non-parent is demonstrated by specific factors. Id. at 580. Particularly, the court adopted factors applied in a North Carolina case, Heatzig v. MacLean, 191 N.C.App. 451, 664 S.E.2d 347 (2008), which involved a child custody dispute between a legal parent and her former same-sex partner as' to children conceived through artificial insemination. The Mullins court discussed and applied the following factors:
|27(1) [B]oth plaintiff and defendant jointly decided to create a family unit; (2) defendant intentionally identified plaintiff as parent; (3) the sperm donor was selected based upon physical characteristics similar to those of plaintiff; (4) the surname of plaintiff-was used .as one of the child’s names; (5) plaintiff participated in the pregnancy and the birth of the child; (6) there was a baptism ceremony where both plaintiff and defendant were identified as parents; (7) plaintiff was identified as a parent on school forms; (8) they functioned together as a family unit for four years; (9) after the relationship between plaintiff and defendant ended, the defendant ..allowed plaintiff the functional equivalent, of custody for three years; (10) defendant encouraged, fostered, and facilitated an emotional and psychological bond, between plaintiff and the child; (11) plaintiff provided care and financial support for the child; (12) the child considered plaintiff to be a parent; (13) plaintiff and defendant shared decision-making authority with respect to the child; (14) plaintiff was a medical power of attorney for the child; (15) the parties voluntarily entered into a parenting agreement; and (16) defendant intended to create between plaintiff and the child a permanent parent-like relationship.
Mullins v. Picklesimer, 317 S.W.3d at 580.
Applying these factors, the Kentucky Supreme Court, in Mullins, determined that the biological mother of the child waived her right to be the sole decision-maker regarding her child and the right to sole physical possession of the child. Mullins, supra. Further, the - court distinguished a non-parent seeking custody or visitation in a same-sex partnership, in which the partners intended to co-parent the child, from other non-parents. Id. The court stated that a grandparent, babysitter, or boyfriend or girlfriend, is distinguishable from a same-sex partner, who the biological or adoptive parent intended to act as a second parent to the child.[22] Id.
*931 | ¡¡sMississippi
In Mississippi, parental preference applies in a custody dispute between a parent and a non-parent. This presumption may be rebutted by clear and convincing evidence that: (1) the parent has abandoned the child; (2)' the parent 'has deserted the child; (3) the parent’s conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody. Wilson v. Davis, 181 So.3d 991, 995 (Miss. 2016).
However, the Mississippi Supreme Court, in Wilson v. Davis, found that the “rigid adherence to proving one of the four precise factors to rebut the natural parent presumption may, in very limited and -‘exceptional circumstances,’ place a child in a circumstance that is clearly not in his or her best interests. And, as is clearly established, the best interests of the child is the lodestar in custody cases.” Id. The court concluded that an' “exceptional circumstance” requires proof of a serious physical or psychological harm or a-substantial likelihood such harm will occur to the child. Id.
The Mississippi Supreme Court has recognized the in loco parentis doctrine. Under Mississippi law, a person in loco parentis is one who stands in place of a parent, having assumed the status and obligations of a parent. An in loco parentis is “any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child.” Id. A person with in loco par-entis status has both the same, duties and liabilities as a legal parent, including a right to custody of the child as against third persons. Although the rights of an in loco parentis are superior to third persons, they are still inferior to those of a natural parent. However, the in loco parentis status may be considered a factor in overcoming the natural-parent presumption in a custody dispute between a parent and a non-parent. Id.
In Griffith v. Pell, 881 So.2d 184 (Miss. 2004), the court found that, an ex-l2flhusband acted in loco parentis by assuming the status and obligations -of a parent before and during his marriage to the mother of a child, who he believed to be his biological child until the identity of the biological father was established in a paternity action. The court found that the ex-husband met his- burden to overcome the natural-parent presumption under the facts of that case. The Mississippi Supreme Court has since reiterated its holdr ing that a non-parent may stand in loco parentis to seek custody but must still rebut the natural-parent presumption. The court has recognized that a non-parent, acting in loco parentis -when a second biological or legal parent was not present in th,e child’s life was an influential, factor in *932 its decision to allow that non-parent some custody or visitation rights. Pell, supra; see also Waites v. Sanford, 152 So.3d 306, 312 (Miss. 2014).

North Carolina

North Carolina recognizes the de facto parent doctrine as well as an in loco parentis status and has considered several custody cases factually similar to the instant case. In North Carolina, a parent loses his or her paramount interest in the care, custody, and control of the child if he or she is found to be unfit or acts inconsistently with his or her constitutionally protected status. David N. v. Jason N., 359 N.C. 303, 307, 608 S.E.2d 751, 753 (N.C. 2005); Boseman v. Jarrell, 364 N.C. 537, 704 S.E.2d 494, 502-03 (2010). The North Carolina Supreme Court has found that “[i]f a legal parent (biological or adoptive) acts in a manner inconsistent with his or her constitutionally-protected status, the parent may forfeit this paramount status, and the application of the ‘best interest of the child’ standard in a custody dispute with a non-parent would not offend the Due Process Clause.” Heatzig, 664 S.E.2d at 350. The determination of whether a parent has acted in a manner inconsistent with his or her constitutionally protected status must be made on a case-by-case basis. Id. at 351.
lanThe North Carolina Supreme Court, in Boseman v. Jarrell, considered a same-sex couple custody dispute and found that the biological mother intentionally and voluntarily created a family unit with her same-sex partner in which her partner was “intended to act—and acted—as a parent.” Boseman v. Jarrell, 704 S.E.2d at 503. In granting joint custody to the two women, the court based its determination on the following:
The parties jointly decided to bring a child into their relationship, worked together to conceive a child, chose the child’s first name together, and gave the child a last name that ‘is a hyphenated name composed of both parties’ last names.’ The parties also publicly held themselves out as the child’s parents at a baptismal ceremony and to their respective families. The record also contains ample evidence that defendant allowed plaintiff and the minor child to develop a parental relationship. Defendant even “agrees that [plaintiff] ... is and has been a good parent. Moreover, the record indicates that defendant created no expectation that this family unit was only temporary.
Id. at 504.
In Davis v. Swan, supra, a former female domestic partner of a child’s biological mother brought an action seeking joint legal and physical custody of the child intentionally conceived during the relationship through artificial insemination. The court found that the biological mother “encouraged, fostered, and facilitated the emotional and psychological bond between plaintiff and the child up until the parties’ separation.” Id. at 476. The North Carolina Court of Appeals affirmed the trial court’s conclusion that the biological parent acted inconsistently with her constitutionally protected right to exclusive care and control of the minor child for the following reasons:
(1) [B]oth plaintiff and defendant jointly decided to create a family unit; (2) defendant intentionally identified plaintiff as parent; (3) the sperm donor was selected based upon physical characteristics similar to those of plaintiff; (4) the surname of plaintiff was used as one of the child’s names; (5) plaintiff participated in the pregnancy and the birth of the child; (6) there was a baptism ceremony where both plaintiff and defendant were identified as parents; (7) plaintiff was identified as a parent on *933 school forms; (8) they functioned together as a family unit for four years; (9) after the relationship between plaintiff and defendant ended, the defendant allowed plaintiff the functional |S1 equivalent of custody for three years; (10) defendant encouraged, fostered, and facilitated an emotional and psychological bond between plaintiff and the child; (11) plaintiff provided care and financial support for the child; (12) the child considered plaintiff to be a parent; (13) plaintiff and defendant shared decision-making authority with respect to the child; (14) plaintiff was [sic] a medical power of attorney for the child; (15) the parties voluntarily entered into a parenting agreement; and (16) defendant intended to create between plaintiff and the child a permanent parent-like relationship.
Id. at 477.
The court further held that, in addition to the legal parent’s conduct, the court must consider his or her intent regarding the relationship between the child and the third party throughout the time of the relationship. The intentions at the end of the relationship between parties are not relevant “because the right of the legal parent does not extend to erasing a relationship between the partner and her child which she voluntarily created and actively fostered simply because after the party’s separation she regretted having done so.” Id.
Further, North Carolina has recognized the value of a person standing in loco parentis in a child’s life. The North Carolina Supreme Coupt stated:
[T]he legal right of a parent to custody may yield to the interests of the child when the parent has voluntarily permitted the child to remain continuously in the custody of others in their home, and has taken little interest in [the child], thereby substituting: such others in his own place, so that they stand in loco parentis to the. child, and continuing this condition of affairs for so long a time that the love and affection of the child and the foster parents have become mutually engaged, to the extent that a severance of this relationship would tear the heart of the child, and mar his happiness.
Mason v. Dwinnell, 190 N.C.App. 209, 660 S.E.2d 58, 71 (2008)(quoting In re Gibbons, 247 N.C. 273, 101 S.E.2d 16, 21-22 (1957))(emphasis in original).
In Mason v. Dwinnell, the North Carolina Supreme Court applied this reasoning to find that a former domestic partner of a natural parent stood in loco parentis or as a de facto parent and had formed a psychological parenting relationship with the child conceived by artificial insemination during the period of the domestic partnership. Id. In granting custody to both women,'the court reasoned that both parties provided emotional and financial care and support for |S2the child. The court found that the trial court’s unchallenged findings showed that the partner had a parent-child relationship and that relationship was presented as such to friends, family, and schools. Id.

Oklahoma

Oklahoma has adopted the doctrine of in loco parentis and has applied the doctrine in several same-sex custody disputes. The Oklahoma Supreme Court has made clear its intent “to recognize those unmarried same sex couples who, prior to Bishop [Bishop v. Smith, 760 F.3d 1070 (10th Cir.), cert. denied, 574 U.S. -, 135 S.Ct. 271, 190 L.Ed.2d 139 (2014)] and Obergefell [Obergefell v. Hodges, 576 U.S. -, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015)] entered into committed relationships, engaged in family planning with the intent to parent jointly and *934 then shared in those responsibilities after the child was born.” Fleming v. Hyde, 2016 OK 23, 368 P.3d 435, 435. Following those decisions, the Oklahoma Supreme Court held that “[p]ublic policy dictates that the district court consider the best interests of the child and extend standing to the nonbiological parent to pursue hearings on custody and visitation.” Ramey v. Sutton, 362 P.3d at 221. Thus, all third parties who stand in loco, parentis have standing to petition for custody, and the best interest of the child standard is applied. Id. (finding that Oklahoma has “consistently given compelling consideration to the best interests of the minor child in custody matters”).
In Ramey, supra, the Oklahoma Supreme Court held that the biological mother’s former partner had standing to petition for custody and visitation of a minor child conceived through artificial insemination during the parties’ relationship. Ramey, 362 P.3d at 218-19. The non-párent and the biological mother were in a relationship for over eight years. During their relationship, the couple decided to have a child together through artificial insemination. The child referred to the non-parent as “Mom.” After the couple’s relationship ended, the | asnon-parent and the biological mother lived as roommates for one-and-a-half years while raising the child together. When the biological mother decided to cut off all interaction between the child and the non-parent, the non-parent sought -a determination of parental rights and custody. The Oklahoma Supreme Court ultimately found the non-parent stood in loco parentis, which would entitle the non-parent to a hearing to determine custody and/or visitation based upon the best interests of the child. Id. at 222. Specifically, the court in Ramey expanded prior jurisprudence and held that:
[The Oklahoma Supreme Court] acknowledge[s] the rights of a non-biological parent in-a same sex relationship who has acted in loco parentis where the couple, prior to [the legalization of same-sex marriage]' (1) were unable to marry legally; (2) engaged in intentional family planning to have a child and to co-parent; and' (3) the biological parent acquiesced and encouraged the same sex partner’s parental role following the birth of the child.
Mat 218.
The Oklahoma Supreme. Court has affirmed this holding in , two recent consolidated appeals. See Newland v. Taylor, 2016 OK 24, 368 P.3d 435 (Okla. 2016); Fleming v. Hyde, 2016 OK 23, 368 P.3d 435 (Okla. 2016) (wherein the court found that the biological mothers’ former partners had standing to pursue custody through a best interest of the child hearing).

South Carolina

South Carolina has jurisprudentially recognized the de facto or psychological parent doctrines for more than a decade. South Carolina has statutorily adopted the de facto doctrine and allows a third party non-parent, who is determined, to be a de facto custodian, to petition for custody and/or visitation of a minor child.
In Middleton v. Johnson, 629 S.E.2d 378 (S.C. Ct. App. 2006), the South Carolina Court of Appeals adopted a four-prong test developed by the Wisconsin Supreme Court to determine whether a person has become a fit psychological | ^parent so as to obtain custody or visitation rights. The court found that, in order to demonstrate the existence of a psychological parent-child relationship, the petitioner, must show:
(1) [T]hat the biological or adoptive par- , ent[s] consented to, and fostered, the petitioner’s formation and establishment of a parent-like relationship with the *935 child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child’s care, education and development, including contributing towards the child’s support, without expectation of financial compensation; - and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.
Id, at 596-97.
In Middleton v. Johnson, Middelton, who believed he was the child’s biological father for the first year of the child’s life, sought visitation with the child. The biological mother allowed Middelton to visit with the child regularly for years until she began dating another ma^ who did not want Middleton in the child’s life. The court found that the child referred to Middleton as “Dad,” that he was thoroughly involved in the child’s academic life and extra-curricular activities, and that Middelton had financially and emotionally supported the child since the child’s birth. In applying the four-prong test discussed above, the court determined that Middleton, as the child’s psychological parent, had standing to seek visitation with the child. Id.
Following years of jurisprudence establishing a psychological or de facto parental status, South Carolina enacted S.C. Code Ann. § 63-15-6Q, which statutorily defines a de facto custodian and sets forth the guidelines by which such persons may obtain custody or visitation. The statute provides:
(A)For purposes of this section, “de facto custodian” means, unless the context requires otherwise, a person who has been shown by clear and convincing evidence to have been the primary caregiver for and financial supporter of a child who: . . ■
Isb(I) has resided with the person for a period of six months or more if the child is under three years of age; or ■ (2) has resided, with the person for a period of one year or more if the child is three years of age or older.
•Any period of time after ‘a legal proceeding has been commenced by a parent seeking to regain custody of the child must not be -included -in determining whether the child has resided with the person for the required minimum period.
(B) A person is not a de facto custodian of a child until the court determines by clear and convincing evidence that the person meets the definition of de facto custodian with respect to -that child. If the court determines a person is a de facto custodian of a child,' that person has standing to seek visitation or custody of that child.
(C) The family court may grant visitation or custody of a child to the de facto custodian if it finds by clear and convincing evidence that the child’s natural parents are unfit or that other compelling circumstances exist.
(D) No proceeding to establish whether a person is a de facto custodian may be brought concerning a child in the custo- ■ dy of the Department of SociaTServices.
(E) If the court has determined by clear ' and convincing evidence that a person is a de facto custodian, the court must join that person in the action- as a party needed for just adjudication under the South Carolina Rules of Civil Procedure.
S.C. Code Ann. § 63-15-60.
Therefore; in South Carolina, a third party who qualifies as a de facto custodian may seek custody or visitation. Nevertheless, as in all custody determina *936 tions, the court must also find that custody or visitation with the de facto parent is in the best interest of the child.

Tennessee

Tennessee courts have consistently held that a third party who is neither biologically nor legally related to the child has no standing to seek custody or visitation. While Tennessee has statutorily protected grandparents and stepparents seeking visitation with a child, Tennessee law does not provide standing for any other third party. In re Hayden C.G.-J., No. M2012-02701-COA-R3-CV, 2013 WL 6040348 (Tenn. Ct. App. 11/12/13). Tennessee appellate courts have consistently held that a same-sex [¡^partner does not meet the definition of a “legal parent” and lacks any standing to seek visitation or custody. See In re Hayden C.G.-J., supra;[23] In re Thompson, 11 S.W.3d 913 (Tenn. Ct. App. 1999), cert. denied. (Tenn. 1/24/00). The Tennessee Supreme Court has not exercised its discretionary authority to consider the correctness of these decisions.

Texas

In Texas, any third party “who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition” has standing to seek custody or visitation. Tex. Fam. Code § 102.003. However, the Texas circuit courts are divided as to whether the biological or legal parent must first relinquish his or her parental rights in order for a third party to prove “actual care, control, and possession of the child” under the above statute.
Some Texas courts require “a showing that the parent has abdicated actual control of the children in order for the non-parent to show standing.” In the Interest of A.C.F.H., 373 S.W.3d 148, 153 (Tex. Ct. App. 2012) (emphasizing the split among the circuit courts of appeal). However, other courts have found that a non-parent may exercise “actual control” in conjunction with the legal or biological parent and be granted joint conservatorship when it is in the child’s best interest. See Berwick v. Wagner, 509 S.W.3d 411 (Tex. App. 2014); In re M.K.S.-V., 301 S.W.3d 460 (Tex. Ct. App. 2009).
Further, while some Texas courts have acknowledged the in loco parentis doctrine, those courts have found that the doctrine is “by its very nature, a temporary status” that may be revoked by a natural parent, and may not be utilized to gain conservatorship of a child after the non-parent is no longer living with the | o7child and standing in loco parentis. Coons-Andersen v. Andersen, 104 S.W.3d 630, 635 (Tex. App. 2003).

Virginia

Virginia courts have declined to adopt the de facto or psychological parent doctrines. In Virginia, the natural parent presumption favoring a parent over a non-parent in custody disputes may only be rebutted when certain factors are established by clear and convincing evidence. Florio v. Clark, 277 Va. 566, 674 S.E.2d 845, 847 (2009). These factors include: “(1) parental unfitness; (2) a previous order of divestiture; (3) voluntary relinquishment; (4) abandonment; and (5) special facts and circumstances ... constituting an extraor *937 dinary reason for taking a child from its parent, or parents.” Id.
However, Virginia does allow a third party with a legitimate interest to seek visitation. A court awarding non-parent visitation over a fit parent’s objection based on the child’s best interests must first find clear and convincing evidence that a denial of visitation would be harmful or detrimental to the welfare of the child. Stadter v. Siperko, 52 Va.App. 81, 661 S.E.2d 494 (2008). In Stadter v. Siperko, a visitation case brought by a mother’s former same-sex partner as to a child who was conceived through artificial insemination during the parties’ relationship, the Virginia Court of Appeals declined to adopt the doctrine of de facto or psychological parent. The court reasoned that even if the former partner had been encouraged by the mother to form a parent-like relationship with the child and the parental responsibilities were shared, in order to be entitled to visitation, the former cohabitant was required to prove that denial of visitation would actually harm the child. In Stadter, the trial court found that the non-parent was a person with a “legitimate interest” in the child and that the mother was a fit parent. Nonetheless, in that case, conflicting expert testimony was presented and the trial court determined that the non-parent failed to meet her burden to prove |¡¡sthat actual harm would result if visitation was not granted. Accepting the trial court’s factual determinations, the reviewing court affirmed the denial of the non-parent petition for visitation.
III. Analysis and Application of Louisiana Law
Louisiana does not statutorily, and has not jurisprudentially, recognized the in loco parentis, de facto parent, or psychological parent status in custody contests between a parent and a non-parent. However, the Louisiana Supreme Court has recognized the psychological parent concept in the context of determining a child’s best interest in an adoption proceeding. In In re J.M.P., the Court found that “ ‘[t]he best interest of the child’ must draw its meaning from the evolving body of knowledge concerning child’s health, psychology and welfare that marks the progress of a maturing society.” In re J.M.P., 528 So.2d 1002, 1013.
In discussing the concept of a psychological parent, the Louisiana Supreme Court has stated:
Whether any adult becomes the psychological parent of a child is based on day-to-day interaction, companionship, and shared experiences. The role can be fulfilled either by a biological parent or by any other caring adult—but never by an absent, inactive adult, whatever his biological or legal relationship to the child. Thus, neither the biological relation nor the fact of legal adoption is any guarantee that an adult will become the psychological parent of a child.
The child’s psychological tie to a parent figure is not the simple uncomplicated relationship that it may appear to be at first glance.
* * *
Continuity of parental affection and care provides the basis for the child’s sense of selfworth and security; parental discipline and example are essential for the child’s development of values and ideals. On the other hand, when parental care is inadequate, or when the child suffers a loss, change or other harmful interruption of the child-parent relationship, particularly in his early years, the child may experience serious deficits in his mental or emotional growth. In such cases, the child may regress along the whole line of his affections, skills, achievements, and social adaptation.
*938 IsaThere is little disagreement within the profession of child psychology as to the existence of the phenomenon of the child-psychological parent relationship and its importance to the development of the child. A substantial and impres- • sive consensus exists among psychologists and psychiatrists that disruption of the parent-child relationship carries significant risks.
In re J.M.P., 528 So.2d 1002, 1013-14 (La. 1988) (emphasis. addedXcitations omitted).
In J.M.P., the Louisiana Supreme Court recognized that the standard applied in a private adoption proceeding differs from that applied in custody disputes. However, the Court also opined that the “psychological parent phenomenon” would be relevant in determining a child’s best interest in any custody dispute. Id.
As modern society continues to evolve in the context of what defines a “family”1 in today’s culture, we should consider—both in enactment of legislation and jurisprudential application of current legislation— the “evolving body of knowledge concerning child’s health, psychology and welfare that marks the ■ progress of a maturing society.” Id. ■■ ' • >
The jurisprudence in custody contests between a parent and a legal non-parent in Louisiana establishes that any non-parent -seeking custody must prove that a custody award to the legal or biological parent- would result in substantial harm to the child. However, under certain circumstances, a non-parent may obtain joint custody of the child by showing that sole custody to the parent without any custody granted to the non-parent would result in substantial harm. The Louisiana Supreme Court, and other Circuit Courts of Appeal, have held that La. C.C. art. 133 allows for the granting of joint custody between a parent and a legal non-parent, when such an arrangement is in the child’s best interest. See McCormic v. Rider, 09-2584 (La. 2/12/10), 27 So.3d 277; C.M.H. v. D.M., 13-1477 (La.App. 1 Cir. 12/27/13), 2013 WL 6858331, 2013 La. App. Unpub. LEXIS 815; Smith v. Tierney, 04-2482 (La.App. 1 Cir. 2/16/05), 906 So.2d 586; See also La. C.C. art. 133, comment (b) (“An award of joint custody to non-parents is not precluded”).
As recently emphasized by the Louisiana Supreme Court in Tracie F. v. Francisco D., supra, the paramount goal and primary consideration in all custody determinations is the best interest of the child. Louisiana jurisprudence recognizes that cüstody determinations are complicated and that “these difficult decisions are always fact-intensive.” Ellis v. Ellis, 50,378 (La.App. 2 Cir. 11/18/15), 184 So.3d 752. Under certain circumstances, trial courts appoint a mental health evaluator to' conduct an evaluation of the children and parties to assist in such á complex analysis. La. R.S. 9:331 provides that a trial court “may order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown.” Court-appointed evaluators have assisted in numerous custody contests between a parent and a non-parent. See Duplessy, supra; Dalferes, 98-1233 c/w 1234 (La. App. 4 Cir. 11/18/98), 724 So.2d 805; C.M.H. v. D.M., 13-1477 (La.App. 1 Cir. 12/27/13), 2013 WL 6858331, 2013 La. App. Unpub. LEXIS 815.
This case presents a complex factual background. The record reflects that the non-parent, Vincent, and the biological parent, Paula, together made the intentional decision to have and co-parent children. Vincent was present at the hospital at the time of the children’s birth, Vincent’s name was placed as the “father” on the. .children’s birth certificates and the children were given his surname. The male *939 twin, Vincent, II, was given the same full name as Vincent at birth. The children have referred to Vincent as “Daddy” since the time they learned to speak.
- The record reflects that Vincent was heavily involved in all aspects of the children’s lives. Independent hospital records reflect that Vincent was “like a therapist in his full-time involvement” in Vincent, II’s medical care for his cognitive developmental delays. Further,, academic records reflect that Vincent |41ensured that the children received preschool education and participated in their academics. Dr. Walsh testified that Vincent has a'“secure bond” with the children that is “vital to their well-being.” Although Vincent is biologically a female, he identifies as a male and the record reflects that the children identify him as their father within their “family.” Moreover, for a period of time in excess of one year, according to Vincent, the children lived with him as their primary caregiver—-with Paula only visiting the children several hours a month. To complicate matters, the biological parent, Paula, has a history of disengaging herself from the daily child-rearing of two other children from a previous relationship.[24]
Under the facts of this case, we find that a comprehensive custody evaluation by a court-appointed evaluator is necessary to properly determine whether “substantial harm” would result to these children if sole custody is granted to Paula. Further, a comprehensive evaluation may assist the trial judge in his consideration of the children’s mental and emotional well-being— i.e., their best interest. Under the facts of this case, we. find that the trial judge abused his discretion in making a custody determination without a comprehensive evaluation performed by an independent, court-appointed custody evaluator pursuant to La. R.S. 9:331.
Accordingly, for the reasons provided herein, we vacate the trial court judgment as it relates to the denial of Vincent’s petition for custody of the minor children. The trial court is ordered to appoint a mental health evaluator to perform a comprehensive evaluation pursuant to La. R.S. 9:331.
PROTECTIVE ORDER
Vincent also appeals the issuance of a protective order against him as it relates to the minor children. On February 19, 2014, Paula filed a Petition for | ^Protection from Abuse, alleging that Vincent had previously “choked,” “stalked,” “shoved,” and threatened her with physical harm.[25] The petition alleged that the most recent incident of abuse took place in November, 2013, when she alleged Vincent told her he would “pop a cap” in her head if she “comes between” Vincent and' the minor children. The petition further alleged that Vincent would not allow her to pick up the children and that she feared Vincent would take the minor chil *940 dren out of state and disappear. This petition makes no allegations of physical abuse to the minor children. The petition was set for hearing on March 11, 2014. On that date, the parties entered into a consent judgment. As the consent judgment relates to the petition for protection from abuse, it provided that Vincent is prohibited from contacting Paula and her relatives or associates in any manner and, further, that Vincent will undergo anger management classes. No further hearings or judgments were issued concerning this petition for protection from abuse.
On August 10, 2015, Paula filed a separate Petition for Protection from Abuse. Five days later, Vincent filed a Petition for Protection from Abuse against Paula. Both petitions arise out of an August 10, 2015 incident that occurred at the children’s school. The Domestic Commissioner issued dual temporary restraining orders, effective until the hearing set for September 1, 2015.
At the hearing before the Domestic Commissioner, both parties testified to their version of the events that led to a physical altercation at the children’s school. Vincent testified that he arrived at Ella Dolhonde School on August 10, 2015, at 8:15 a.m. to watch the children walk into their first day of school for third grade, just as he did for pre-k, kindergarten, first and second grades. He testified that as he approached Paula, Robert, and the children, Paula began yelling at him that he |4Shad no right to see the children. Vincent testified that, at some point, Paula raised her hand to hit him and, as he put up his hand up to block her hit, his watch got stuck in her hair and the two began to struggle. He stated that Robert then ran over to him and punched him on the top of the head at least two times. In response to Paula’s allegations that he spit in her face during the altercation, Vincent denied ever spitting in Paula’s face or intentionally harming her. Vincent was arrested following the altercation. Vincent testified that he was the only party arrested because he was the only African-American involved and alleged that two of the three officers agreed that Robert and Paula should also have been arrested.
Robert testified that, as he and Paula and the children were walking into the schoolyard, Vincent approached them saying, “I want to see my kids... I want to take pictures of my kids...” Robert stated that Paula turned around and told Vincent to leave them alone, but that Vincent would not leave. Robert testified that Vincent did not physically restrain him or Paula from entering the schoolyard gate but was in their personal “space” and being a “bother.” Robert continued walking and did not witness the initial altercation between Vincent and Paula. He stated that he turned around when he heard Paula screaming, and saw Vincent pulling Paula back and forth by her hair. He ran over to Paula and Vincent and “punched” Vincent in the head at least two times but no more than four times. Robert testified that Vincent pulled Paula’s hair “to the scalp” and that he has “no doubt” Vincent’s actions were intentional,
Paula testified that, as she and Robert and the children approached the schoolyard gate, Vincent physically blocked them from entering. Paula testified that she turned around “screaming” for Vincent to leave them alone and telling Vincent that the children were not “her” children. Paula testified that “every time 144she [Vincent] comes around... she’s always causing a scene.”[26] Paula testified that Vincent then *941 spit in her face and, as she raised her hand to block Vincent’s spitting, he grabbed her by the hair and pushed her to the ground, then began yanking her back and forth as she screamed for help. As a result of the altercation, Paula claims to suffer from nightmares, headaches, and head and shoulder pain.
Paula testified that Vincent has been physically abusive to her in the past during their relationship. Paula recalled one incident where she alleged Vincent “choked” her while she was holding one of the twins as a baby; a second incident in which she alleged he “shoved” her into a wall when she threatened to end the relationship; and a third incident in which she alleged he put her in a choke hold after an argument concerning laundry. Paula testified that she did not report the prior incidents to the police because she feared Vincent would kill her if she reported them.
A video-recording of the altercation was introduced into evidence. Vincent began recording on his cellular phone as he walked to the school and approached Paula, Robert, and the children. The video reflects that when Vincent approaches, Paula quickly turns the children toward her, stating to Vincent, “these are my eggs.. .these are not your children.” It is difficult to ascertain from the video the series of events that led to the physical altercation, as the cellular video is choppy and unclear. Following the altercation, which involved unpleasant words by all parties involved, Paula is seen yelling at Vincent that he had spit in her face and pulled her hair and Vincent is heard yelling that Paula raised her hand to hit him.
The transcript of the hearing reflects the Domestic Commissioner made the following findings:
This incident should never have happened.
I $ ⅜ ⅜
She had no business going toward him. Okay? She was headed into the school. She should have kept going into the school to get her kids enrolled in school, not going to confront him, which caused a physical altercation. Her husband assaulting him, admittedly punching him in the head on her behalf, I think is cause. I don’t believe you got your hand tangled in her hair. I believe you grabbed her hair and yanked it and yanked her all over the place in that yard. That’s what I believe... .You-all need to figure this out; otherwise, it’s going to be like this for the rest of these kids’ lives and the kids are going to grow up to be really messed up because the two adults that brought them into the world, no matter how you brought them into the world, you two people brought these children into the world. You made that choice. You need to start behaving like adults who care for somebody other than themselves. That’s what you need to start behaving like. It’s all about me, me, me, me, my, my, my, my, instead of what’s going on in this world that’s best for these children. I don’t know what’s going on with you-all, but you better change. (Emphasis in original).
At the conclusion of the hearing, the Domestic Commissioner issued dual protective orders for a period of six months. The parties objected to the issuance of the orders against them.
The trial judge conducted hearings on September 9, 2015, and September 22, 2015 on the dual petitions for protective *942 orders.[27] At the protective order hearings before the trial judge, Jennifer Snowden, a teacher at the children’s new school,[28] testified that she was present at the schoolyard on August 10, 2015. She stated that she witnessed “Vincent grabbing [Paula] by the hair and swinging her backwards .... a good ten to twelve feet.” She testified that she did not see Paula do anything to provoke Vincent’s “very violent” behavior but she did see Vincent spit in Paula’s face. Ms. Snowden testified that this altercation was “not the first” incident involving Vincent at the school and that he has now been banned from the school grounds.[29]
JjjMs. Snowden provided the Court with surveillance video from the date of the incident at the schoolyard. The video was viewed by all parties and introduced into evidence. The video provides a view, from a distance, of the schoolyard altercation. The video reflects Vincent following Paula, Robert, and the children into the schoolyard. Shortly thereafter, Paula turns around to Vincent, and the parties appear to be arguing in close proximity. The video shows Paula raise her hand and subsequently shows Paula and Vincent struggling. The video shows Vincent pulling Paula while backing up towards the school gate and shows Robert dropping bags to run towards Paula and Vincent. The video does not provide a clear view of the entire altercation and does not contain audio-recording.
Robert and Vincent both testified at the hearing before the district judge and provided testimony similar to that provided before the Domestic Commissioner, Vincent reiterated his version of events—that his watch became stuck in Paula’s hair when he raised his arm to block her from hitting him and that he- backed up or moved because he saw Robert coming after him. Robert reiterated his version of events—that he observed Vincent violently drag Paula across the schoolyard and that he subsequently ran over to them to punch Vincent on the top of his head. He testified that he would not have hit Vincent if he did not feel it was necessary to protect his wife. He further testified that Paula had blood at the root of her scalp and a headache for several days following the altercation.
At the conclusion of the hearing, the trial judge granted Paula’s petition for protection from abuse. The trial 'court issued a protective order against Vincent, prohibiting him from abusing, harassing, interfering, or contacting Paula, in addition to requiring him to stay more than 100 yards from either Paula’s residence or place of employment. As to Paula, the trial judge granted the protective order for her lifetime. As to the children, the trial judge granted the protective order until the time that the children attain the age of eighteen years.
| mLaw and Analysis
The purpose, of the Domestic Abuse Assistance Law is to “provide relief to victims of domestic violence by establishing a ‘civil remedy for domestic *943 violence which will afford the victim immediate and easily accessible protection.’” Alfonso v. Cooper, 14-0145 (La. App. 4 Cir. 7/16/14), 146 So.3d 796, 805 (citing Vallius v. Vallius, 10-0870 (La. App. 4 Cir. 12/8/2010), 53 So.3d 655, 658, quoting Branstetter v. Purohit, 06-1435 (La.App. 4 Cir. 5/2/07), 958 So.2d 740, 743)). Pursuant to La. R.S. 46:2135(B), a petitioner has the burden of proving the allegations of abuse by a preponderance of the evidence. “Domestic abuse” is defined in the Domestic Abuse Assistance Law as including, but not limited to, “physical or sexual abuse and any offense against the person, physical or non-physical, as defined in the Criminal Code of Louisiana, except negligent injury and defamation, committed by one family member, household member, or dating partner against another.” La. R.S. 46:2132(3).
A trial court is afforded discretion in the issuance of a protective order and the trial court’s order is reversible only upon a showing of an abuse of discretion. Ruiz v. Ruiz, 05-175 (La.App. 5 Cir. 7/26/05), 910 So.2d 443, 445; see also Hill v. Nelson, 15-0885 (La. App. 4 Cir. 02/24/16), 2016 La. App. Unpub. LEXIS 84; Rouyea v. Rouyea, 00-2613 (La.App. 1 Cir. 3/28/01), 808 So.2d 558, 561.
Vincent does not appeal the protective. order as it relates to Paula.[30] Rather, he appeals only the protective order as it relates to the children. A.review of the record reflects that none of the three petitions for protection from abuse filed make any allegations of physical abuse by Vincent as to the children. Given our holding herein as to Vincent’s appeal of the denial of his petition for custody, wherein we remand this matter for a comprehensive evaluation to assist in a custody determination, we vacate the protective order issued as it relates to the minor Lschildren only. The trial judge’s granting of the protective order is. otherwise affirmed.
CONCLUSION
Accordingly, for the reasons provided herein, we vacate the trial court judgment as it relates to the denial of Vincent’s petition for custody and remand this matter for further proceedings consistent with this opinion. Further, as to the trial court’s judgment granting Paula’s petition for protection from' abuse, we vacate the protective order as it relates to the minor children. In all -other respects, the protective order is affirmed.
CUSTODY JUDGMENT VACATED; PROTECTIVE ORDER AFFIRMED IN PART, VACATED IN PART; MATTER REMANDED
MURPHY, J., CONCURS WITH REASONS

. The record reflects that the biological mother-appellee is identified with three different surnames throughout the record as well as two first names. For purposes of this opinion, we will identify appellee as "Paula.”

. The record reflects that appellant herein, Vincent, was named at birth as Cheryl Vanessa Ferrand but was known as Vincent. On April 21, 2006, Vincent legally changed his name to C. Vincent Ferrand.

. The Consent Judgment, signed on March 27, 2014, provided the following; (l)Vincent is prohibited from contacting Paula or any óf her relatives; (2) neither party shall disparage the other party or discuss the - proceedings with the children; (3) Vincent is ordered to attend anger management classes and provide certification to the court upon completion; (4) the parties shall not remove the children from the school they attend; (5) the parties are prohibited from changing the children's permanent residence outside of the jurisdiction of the court; (6) Vincent is granted visitation with the children on the third weekend of every month from Friday afternoon through Monday morning, The Consent Judgment further provided that "all provisions of this judgment are interim and without prejudice.”

. The Domestic Commissioner also .denied Paula's exception of no right of action. Neither party sought review of that judgment.

.The record reflects that three separate judgments (March 9, 2015, March 18, 2015, and March 24, 2015) were signed by the Domestic Commissioner following the January 26, 2015 hearing. Concerning Vincent’s request for a court-ordered evaluation, the March 9, 2015 judgment states that the request was continued and reset to March 24, 2015. The March 18, 2015 judgment does not deny Vincent's motion, but states that "an expert is allowed to be utilized by the parties in this matter. This expert will be allowed to meet and evaluate the children. C. Vincent Ferrand is 100% responsible'for paying the costs of the expert's services.” The March 24, 2015 judgment states that “an expert is:allowed to testify in a trial of this matter. This expert will be allowed to meet and evaluate the children.” It further provides that "Paula Ferrand makes the children available through C. Vincent Fer-rand to meet with the expert.”
Paula filed a "Motion to Clarify Multiple Orders,” asserting that the March 18, 2015 judgment was the only judgment approved by all parties prior to submission to the court, The Domestic Commissioner denied Paula's motion ex parte, However, the Domestic Commissioner subsequently wrote “vacated” on the March 18, 2015 and March 24, 2015 judgments, Nevertheless, the record is inconsistent because there are other copies of a March 24, 2015 judgment in the record that do not contain the Domestic Commissioner’s, written language “vacated." The record does not indicate that the March 9, 2015 judgment, continuing Vincent's motion to appoint an evaluator, was ever vacated.

. On March 18, 2015, Vincent filed a Rule for Contempt against Paula, asserting that she failed to comply with one of the Domestic Commissioner’s orders to cooperate and make the children available to meet with Vincent’s selected expert. The rule for contempt , alleged that Vincent made a scheduled appointment for the children to meet with his expert, Dr. Marianne Walsh, and provided Paula and her counsel notice of the appointment one week prior. The rule for contempt alleged that Paula failed to bring the children to the appointment. Further, it alleged that when Vincent subsequently' attempted to check the children out of school to bring them to the appointment, Paula informed the school that Vincent was not permitted to check the children out of school for the appointment! Vincent attached to his rule for contempt correspondence from Dr, Walsh, documenting two unsuccessful attempts to meet with the minor children in March, 2015,

. Vincent testified that he and Paula, as a same-sex couple, were unable to obtain a marriage license at that time.

. Vincent testified that he and Paula shared an intimate relationship and that Paula “absolutely” knew that Vincent was biologically female, thereby the couple would be required to undergo fertility treatments • to conceive a child.

. The male twin, Vincent, II, shares the same full name as Vincent. Vincent testified that he and Paula together chose Caitlin’s name.

. A copy of the children’s original birth certificates, listing Vincent as the father and Paula as the mother, was introduced into evidence at the trial.

. A copy of the letter from the school, addressed only to Vincent, was introduced into evidence at trial.

.The record is lacking any additional information concerning Paula’s relationship with her two other children who live with their father. Vincent testified at the custody trial that Paula “walked away” from those children when they were ages 2 and 4. However, Paula’s counsel, on cross-examination, makes reference to Paula sharing joint custody of those children, with the father having domiciliary status. The reason for Paula’s decision to not physically live with those children or participate in those children’s daily lives is unclear from the record.

. In his testimony, Vincent discussed an incident in which, in May, 2013, he had to bring Vincent, II, to the hospital for an asthma attack. He emailed Paula to see if she could keep Caitlin while he went to the hospital. He testified that Paula simply responded by email to drop Caitlin off to the pool, but did not inquire at that time as to Vincent, II’s well-being or offer to accompany him and the children to the hospital. He testified that he decided to bring Caitlin with him to the hospital because she was worried about her little brother and wanted to go to the hospital to be with him.

. Vincent expressed concern about Robert's behavior around the children. Specifically, Vincent recalled an incident during which he visited with Robert and saw him drink five beers in an hour and fifteen minutes while in the swimming pool with the children. He stated Robert was drunk and told him that he sees a psychiatrist. The relationship between Robert and the children was not evaluated and is not clear from the record before us. Vincent further expressed concern about Paula’s parenting, recalling three incidents in which Paula "beat” or "headbutt” Vincent, II. Vincent also expressed concern about Paula treating the children with Zoloft medication, when he alleged such medication was not necessary under his care.

. A copy of the email communication was introduced into evidence at trial. .

. At the time the twins were born, there was no legal avenue through which Vincent could obtain parental rights. Paula and Vincent, a biologically same-sex couple, met in the year 2000, and the children were born in 2007. Because they were not married, Vincent *919 could not have adopted the children legally under Louisiana law without Paula relinquishing her parental rights. See La. Ch.C. art. 1221 (stating that ‘‘a single person, eighteen years or older, or a married couple jointly may petition to privately adopt a child.'') and La. Ch.C. art. 1240 (stating that, upon a final judgment of adoption, the natural parents are "divested of all their legal rights with regard to the adopted child"); see also Adar v. Smith, 639 F.3d 146 (5th Cir. La. 4/12/11), writ denied, 565 U.S. 942, 132 S.Ct. 400, 181 L.Ed.2d 257 (2011). Moreover, during that time period, prior to the United States Supreme Court's decision in Obergefell v. Hodges, — U.S. —, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), Louisiana did not recognize same-sex marriage and would not have recognized an out-of-state marriage. See La. C.C. art. 3520(B); see also Costanza v. Caldwell, 14-2090 (La. 7/7/15), 167 So.3d 619.

. La. C.C. art. 134 provides:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. See COMMENT: “DON’T TALK TO [LEGAL] STRANGERS”: LOUISIANA'S PARENTAGE POLICY AND THE BURDENS IT PLACES ON SAME-SEX PARENTS AND THEIR CHILDREN, 16 Loy. J. Pub. Int. L. 167 (2014).

. The Third Circuit Court of Appeal is the only Louisiana court that has considered a same-sex custody dispute between a parent and non-parent under La. C.C. art. 133. In Black v. Simms, a 2009 case, the Third Circuit considered a same-sex custody dispute wherein the non-biological partner sought custody of a child conceived through artificial insemination. Applying La. C.C. art. 133, the court determined that the non-parent partner failed to meet her burden to prove substantial harm. Specifically, in its analysis, the court considered the fact that the non-parent waited more than one year after visitation ceased before filing her petition for custody. Further, the concurring opinion recognized that, even if the'non-parent had met the substantial harm burden, the record reflected that custody with the non-parent would not,be in the child’s best interest, under the facts of that case. 08-1465 (La.App. 3 Cir. 6/10/09), 12 So.3d 1140.
None of the other four Louisiana Circuit Courts of Appeal nor the Louisiana Supreme Court has considered a factually similar same-sex couple custody dispute under the La. C.C. art. 133 analysis. Black v. Simms is the only Louisiana case to consider a custody dispute between same-sex partners, where the same-sex couple is not married and the non-biological parent has not adopted the child. Compare Palazzolo v. Mire, 08-0075 (La.App. 4 Cir. 1/7/09), 10 So.3d 748 (wherein the Fourth Circuit recognized an out-of-state adoption of a child, conceived through artificial insemination during a same-sex couple relationship, and treated the non-biological *922 parent as an adoptive or legal parent and, thus, applied-La, C.C. art, 131 and 134 to determine custody between the same-sex couple).

. In V.L. v. E.L., — U.S. —, 136 S.Ct. 1017, 194 L.Ed.2d 92 (2015), the United States Supreme Court, in a per curiam opinion, reversed a decision by the Alabama Supreme Court which refused to grant full faith and credit to a Georgia court’s judgment of adoption granted to the biological mother’s same-sex partner, who had co-parented that child since birth. The Supreme Court’s decision was based entirely on the Constitution’s Article IV, full faith and credit clause.

. Georgia has acknowledged the in loco par-entis doctrine in a custody dispute, however, at this point, it has been applied only in Department of Family and Children Services cases. See May v. State, 295 Ga. 388, 761 S.E.2d 38 (2014); Drummond v. Fulton Cty. Dep’t of Family & Children Servs., 237 Ga. 449, 228 S.E.2d 839 (1976).

. The court recognized other states that have addressed the issue of a non-parent seeking custody or visitation of a child born to or adopted by their same-sex partner. The court stated:
Several of our sister states have found that the nonparent has standing to seek custody or visitation of the child when the’ child was conceived by artificial insemination with the intent that the child would be co-parent *931 ed by the parent and her partner, and the parent and her partner had thereafter co-parented the child for a period of time. See, e.g., In re Parentage of L.B., 155 Wash.2d 679, 122 P.3d 161 (2005) (partner had standing as a common law de facto parent which was limited to nonparents who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child’s life); J.A.L. v. E.P.H., 453 Pa.Super. 78, 682 A.2d 1314 (1996) (mother's former domestic partner stood in loco parentis with child and, therefore, had standing to seek partial custody of child born during their relationship); In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419 (1995) (nonparent has standing to seek visitation of child if a parent-like relationship with the child is shown); A.C. v. C.B., 113 N.M. 581, 829 P.2d 660 (N.M.Ct.App.1992) (former partner who had entered into oral co-parenting agreement had standing to seek joint legal custody and time-sharing of partner’s biological child).
Id. at 575.

. The court, in In re Hayden C.G.-J., recognized that the state's legislature "has not chosen to address the situation presented in this case, where the parties have never been married and the individual who is not biologically related to the child and has not adopted the child seeks visitation. We do not consider this an oversight, but rather a reflection of legislative satisfaction with the way the law has stood....” In re Hayden C.G.-J., supra.

. As stated in footnote 12, the relationship between Paiila and her two other biological children, who live with their father, is unclear from the record.

. The February 19, 2014 Petition for Protection from Abuse is the second petition for protection Paula filed. The record reflects that, two years prior, on November 15, 2011, Paula filed a Petition for Protection from Abuse against Vincent, alleging that Vincent threatened her with bodily harm, death, and with a weapon. The November 15, 2011 peti- ■ tion makes no allegations of abuse against the minor children. Attached to this petition is an email to a third-party, wherein Paula expresses her fear of Vincent and, further, expresses that, in 2010 (3 years after undergoing in vitro fertilization and 10 years into her relationship with Vincent), she had no knowledge that Vincent was biologically a female. This petition was dismissed on December 6, 2011, for Paula’s failure to appear for the hearing set on her petition.

. The record indicates that, during the parties relationship and prior to the initiation of litigation, Paula referred to Vincent using the male pronoun ''he.” However, subsequent to *941 the commencement of litigation, Paula now refers to Vincent using the female pronoun “she.”

. Vincent proceeded pro se as to the protective order issues.

. Paula removed the children from their pri- or school, J.C. Ellis, and moved them to Ella Dolhonde,

. Paula’s counsel introduced into evidence a letter addressed to Vincent from the Jefferson Parish School Superintendent, dated August 12, 2015, informing him that he is prohibited from entering school grounds. In his testimony, Vincent testified that he was named Parent of the Year at the children’s old school, J.C. Ellis, and that the children have only been at this new school since after the custody litigation began. Vincent did not provide any documentation to support his testimony.

. Vincent does not brief any argument as it relates to the protective order issued against him in favor of Paula. Any assignment of error that is not briefed is considered abandoned on appeal. Therefore, to the extent Vincent intended to appeal the -protective order as it relates to Paula, we deem that assignment as abandoned. See State v. Kent, 15-323 (La.App. 5 Cir. 10/28/15); 178 So.3d 219, 231.