WILLIAMS, J.
|,In this child custody dispute, the mother, Eloísa Corral, appeals a trial court judgment designating the father, Mark David Corral, as domiciliary parent of the minor child. For the following reasons, we affirm.
*795 FACTS
Mark David Corral and Eloísa Corral were married on April 28, 2005. Of the marriage, one child, Devronic, was born on September 19, 2005. On July 23, 2010, Mark filed for divorce, requesting joint custody of Devronic. He also requested that he be designated domiciliary parent of the child. Eloísa filed an answer and re-conventional demand, requesting that she be designated domiciliary parent of Dev-ronic.
On October 7, 2010, the parties entered into a joint stipulation, whereby they agreed to joint custody of Devronic. The visitation schedule provided that Eloísa would have physical custody of Devronic from 12:00 p.m. Sunday until 8:00 a.m. Thursday “or upon delivery at school”; Mark would have physical custody of Dev-ronic from 8:00 a.m. Thursday until 12:00 p.m. Sunday. The order also provided that in the event that Mark had to work evenings during his periods of custody, Eloísa would have “the right of first refusal to keep the minor child while [Mark] is at work.” The order also prohibited both parties from “entertain[ing] overnight guests of the opposite sex not related by blood or marriage while the minor child is present.” The trial court entered a consent judgment ratifying the joint stipulation. The court also appointed Sandi Davis, a licensed professional counselor, to conduct a mental health evaluation of the parents and the|2child.
A trial to determine custody of the child was held on October 21, 2011. The evidence established the following: Devronic is currently in the first grade; he is well-behaved and makes good grades; Eloísa is employed as a bartender at a concert venue in Bossier City; she works weekends, which allows her to be with Devronic on weekdays; Eloísa was born in the Philippines and has been in the United States since 2001; Eloísa has not obtained her United States citizenship; Mark is currently a member of the United States Air Force, stationed at Barksdale Air Force Base; he works as an aircraft repairman; his normal work schedule is from 11:00 p.m. until 7:00 a.m. Sunday night through Friday morning; when he has to work during his periods of visitation, Devronic is with Eloísa or a babysitter; Mark has been deployed at least once per year during the marriage; each deployment has lasted for four months; Mark also has had temporary duty (“TDY”) assignments; each TDY assignment has lasted from eight days to two weeks; Eloísa takes care of Devronic during Mark’s deployments and TDY assignments; Eloísa attends all of Devronic’s school events and has been primarily responsible for making sure his homework assignments are completed; Mark handles the homework assignments when Devronic is with him; Mark does not attend school events.
At the conclusion of the trial, the court awarded joint custody of Devronic to Mark and Eloísa, with Mark being designated the domiciliary parent. Mark and Eloísa were ordered to “split custodial care” of the child as follows:
|sELOISA CORRAL shall have visitation with the minor child every Monday after school until the following Thursday 8:00 a.m. when the child is returned to school and alternating Sundays from 9:00am until 2:00pm;
MARK DAVID CORRAL shall have custodial care of the minor child from Thursday after school until the following Monday when the child is returned to school[,] with the exception of alternating Sundays from 9:00 a.m. until 2:00 p.m. as enumerated above.
The court also awarded specific visitation for Mother’s Day, Father’s Day, Easter, Spring Break, Thanksgiving and Christ *796 mas. The order further provided that should either parent have to work during their periods of visitation, then “they shall contact the other parent and offer them the right of first refusal to care [for] the minor child before leaving the minor child with another family member or babysitter.”
Eloísa appeals.
DISCUSSION
Eloisa contends the trial court erred in failing to consider all of the factors set forth in LSA-C.C. art. 134 when designating the father as the domiciliary parent of the minor child. She also argues that the court failed to address evidence of Mark’s alleged extramarital affairs and “sexual lifestyle.”
It is well settled in our statutory and jurisprudential law that the paramount consideration in any determination of child custody is the best interest of the child. LSA-C.C. art. 131; Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731; Semmes v. Semmes, 45,006 (La.App.2d Cir.12/16/09), 27 So.3d 1024; Shivers v. Shivers, 44,596 (La.App.2d Cir.7/1/09), 16 So.3d 500. The court is to consider all relevant factors in ^determining the best interest of the child. LSA-C.C. art. 134.[1]
The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in LSA-C.C. art. 134, but should decide each case on its own facts in light of those factors. Semmes, supra; Robert v. Robert, 44,528 (La.App.2d Cir.8/19/09), 17 So.3d 1050, writ denied, 2009-2036 (La.10/7/09), 19 So.3d 1; Bergeron v. Bergeron, 44,210 (La.App.2d Cir.3/18/09),5 6 So.3d 948. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. Id.
LSA-R.S. 9:335(A)(2)(b) provides that, to the extent feasible and in the best interest of the child, physical custody of the child should be shared equally. However, the law is clear: substantial time, rather than strict equality of time, is mandated by the legislative scheme providing for joint custody of children. Semmes, supra; Stephenson v. Stephenson, 37,323 (La.App.2d Cir.5/14/03), 847 So.2d 175.
The trial court has vast discretion in deciding matters of child custody and visitation. Semmes, supra; Slaughter *797 v. Slaughter, 44,056 (La.App.2d Cir.12/30/08), 1 So.3d 788; Gaskin v. Henry, 36,714 (La.App.2d Cir.10/23/02), 830 So.2d 471. Therefore, the trial court’s determination will not be disturbed on appeal, absent a clear showing of an abuse of discretion. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Semmes, supra; Slaughter, supra. As long as the trial court’s factual findings are reasonable in light of the record when reviewed in its entirety, the appellate court may not reverse even though convinced it would have weighed the evidence differently if acting as the trier of fact. Id.
In the instant case, Eloisa and Mark testified that Devronic is a bright, well-adjusted child. Eloisa testified that she is a good parent to Devronic; Mark testified that he is a good parent to Devronic. They both agreed that the current custody and visitation schedule works “pretty good for the most part.” However, both expressed concerns about Devronic’s environment | fiwhen he is with the other parent.
Ms. Davis, who conducted the mental health evaluation of the parties, prepared the following recommendation:
It is recommended for Eloisa and Mark Corral to have a joint custody plan with Eloisa having physical custody of the minor [child] from Monday after school until Thursday morning. Mark should continue to have the child every Thursday, picking him up from school and taking him back to school Monday morning. Eloisa should have [the child] every other Sunday from 9am-2pm so she can take him to church. I am seriously concerned about the overall influence Eloisa has on [the child]. She hasn’t handled her temper very well and doesn’t seem to have a moral compass to know how to filter what her brain thinks and what comes out of her mouth. [The child] needs to be positively influenced and guided in the right direction. He is a precious little boy who has begged his parents to stop talking to each other and to stop fighting over and over. He has struggled and wondered if his daddy was going to take care of him and had doubt in his voice when wondering if his mother would take care of him. Eloisa is working on gaining her United States citizenship that she doesn’t have at this point. There was some discussion about her moving to San Antonio to be with her family. Although this is not a relocation evaluation, I would recommend that [the child] not be allowed to move away from his father. Because of Mark being in the military, he is likely to be deployed again sometime in the future, which should be the only time that [the child] is left in his mother’s care.
* * ⅜
Ms. Davis described Devronic as “very energetic and just very lively.” She stated that he had “a lot of affection for both of his parents[.]” Ms. Davis testified that Devronic seemed more attached to Mark, and he had verbalized that he wanted to spend more time with Mark. She described the communication between Mark and Eloisa as “very volatile at times.” After evaluating both parents and the child, Ms. Davis recommended that Mark be designated the domiciliary parent because “I thought based on all |7that I have had, information wise, that [Mark] would be better suited for that.” On cross examination, Ms. Davis admitted that Eloisa’s morality was a “big, big concern.”
Gayle Breffeilh, a licensed clinical social worker, was accepted by the court as an expert in family counseling and anger management. Ms. Breffeilh testified that she provided counseling services to Eloisa for approximately one year, beginning in June, 2010. She stated that Eloisa volun *798 tarily sought counseling for co-parenting concerns, stress management, anger management and issues associated with the separation and divorce. Ms. Breffeilh also testified that Eloisa expressed anger regarding limited financial means and her belief that Mark would “manipulate the system and she would not be treated fairly.” She stated that during counseling sessions, Eloisa learned methods of reducing stress and to “walk away and calm down” prior to getting “to the point where you’re going to curse or yell.” Ms. Bref-feilh also testified that she observed significant progress in Eloisa’s stress management and anger management. She opined that Eloisa’s episodes of anger would decrease as long as she continued to follow through with the techniques she learned in counseling.
Mark and Eloisa both testified regarding accusations of infidelity during their marriage. Mark testified that he never had a sexual relationship with anyone other than Eloisa during their marriage. He stated that Eloisa accused him of having affairs “multiple times.” She even went so far as to report him to his first sergeant. He was investigated for adultery but was never disciplined for any misconduct. He admitted that he stopped having | «sexual intercourse with Eloisa because they argued “all the time” and he felt “no emotion” toward her. He also testified that it was typical for Eloisa to lose her temper and use profane and vulgar language. Mark further testified that Devronic would sometimes repeat comments made by Eloi-sa.
Eloisa testified that Mark engaged in “quite a few” extramarital affairs during their marriage. She also stated that she once confronted a woman about having an
affair with Mark and ended up being “detained” by military police for creating a disturbance.[2] Eloisa also admitted that she confronted one of Mark’s female coworkers about having an affair with Mark, warning the woman to “stay away from my family.” Eloisa later learned that she had targeted the wrong woman, so she apologized to the woman. She testified that she suspected that Mark has having affairs because he stopped having sex with her during the second year of their marriage. Eloisa also testified that Mark did not pay the household bills during his last deployment and “drained all of the money” from their joint bank account. Eloisa admitted that she had engaged in an extramarital affair during Mark’s last deployment. She also admitted to the following disturbing behaviors:
— she has experimented with cocaine, but she lied to Ms. Davis about it because she was “scared”;
— she served beer at Devronic’s sixth birthday party. She stated that only the adults drank the beer, and “I’ve never been to any sort of birthday party where they didn’t even at least serve ... some sort of beer. And I didn’t think that [it is] illegal at all, just, you know, for some adults”;
In— despite the trial court’s order, she has had sexual intercourse with a man while Devronic was asleep in the house; the man has spent the night with her while Devronic was there;
— she has had parties, some of which have lasted until 4 a.m., while her son slept. She stated, “I don’t understand what’s wrong with that as long as my son was in bed ... and taken care of’;
*799 — she has used vulgar language and berated Mark in Devronic’s presence “plenty of times.”
Several photographs of Eloisa were admitted into evidence. In one photograph, she was smiling into the camera while squatting in her parents’ driveway, with her dress around her waist and her panties around her thighs. She testified that she was urinating outside because she could not wait until someone came to the door. Other photographs depicted Eloisa scantily dressed and partying on top of bars, sticking her tongue out near a woman’s belly button, and drunkenly dancing with her dog with her panties exposed. She stated, “I’m a good mother, but I’m still alive. There is no reason for me to just act like I can’t have fun. I’m still young.”
Additionally, a compact disc containing a recording of an argument between Mark and Eloisa was admitted into evidence. On the recording, Eloisa was heard screaming and using vulgar language, while Devronic was heard saying, “Stop fighting.” Eloisa testified that Mark “picked a fight” with her and started recording “as soon as I was already fired up.” She admitted that she used profanity in the presence of her child and did not stop when the child asked her to do so because “it was already too late.” She blamed Mark for starting the argument because “he knew what was going to happen.” During the argument, Eloisa berated Mark, and Devronic began to |inmimic some of the derogatory comments she had directed toward Mark. Additionally, text messages were introduced into evidence in which Eloisa made insulting and vulgar comments to Mark.
Ms. Davis expressed concern about Eloi-sa’s inability to control her anger once she becomes “fired up.” She also expressed concern about the recorded “berating comments, hearing the derogatory remarks” Eloisa made against Mark in front of Dev-ronic. She stated, “I know that neither of these parents are [sic] perfect, but that whole attitude was very disturbing to me.”
With regard to the recording, Ms. Bref-feilh testified that her primary concern was that the conduct took place “within earshot of the child.” She stated that such conduct, if done habitually, would be “very detrimental to the child.”
Several former neighbors of the couple also testified at the trial. Tasha Holmes testified that she lived near Mark and Eloisa when they lived on Barksdale Air Force Base. She stated that during Mark’s deployment, Eloisa would host parties when Devronic was present. She also testified that on one occasion, her husband found Devronic, who was two or three years old, outside the house alone. Ms. Holmes stated that her husband carried the child home.
Christy Swanton testified that she lived next door to Mark and Eloisa, and she and Eloisa were “best friends” at one time. She stated that Eloisa’s “partying” increased when Mark was deployed; Eloisa would leave Devronic with her family when she went out. On one occasion, Eloisa stayed out all night, returning in the middle of the afternoon the following In day. Ms. Swanton also testified that her friendship with Eloisa ended when their “hanging out, partying” began to negatively affect Swanton’s marriage.
Tamara Rangel, another former neighbor testified as follows: she met Mark through her neighbor, Christina, in June or July of 2010; she did not meet Eloisa until “around November” of 2010; she knew Eloisa “as an acquaintance,” but she knew Mark “on a friendship level”; Mark had mentioned Eloisa to her and told her that “he was going through a divorce, that they were separated”; Mark and Christina *800 were “very friendly”; she had seen Mark and Christina kissing “multiple” times; one day, between October and December 2010, she went to Christina’s house and saw Mark outside on the sidewalk; she entered Christina’s house and saw Christina “laying [sic] naked on the couch” while Devronic was upstairs asleep; Mark had stated to her that Devronic “knows not to tell mommy about Christina”; she had seen some of Mark’s belongings at Christina’s house; she knew Mark and Christina were sexually involved based on comments made by Christina; Mark attended parties at her house and allowed Devronic to stay up and play video games until “four and five in the morning”; during the parties, Devronic witnessed “all the partying, the drinking, [and] the drinking games”; she, Christina and Mark are no longer friends; she and her friend, Rachel, approached Eloisa and told her about Mark’s affair with Christina.
Rachel Vowell, who lived approximately five blocks from Mark and Eloisa, testified as follows: she met Eloisa in 2009 when their children began pre-kindergarten; she and Eloisa became friends; she met Mark in the 112fall of 2010; she had seen Mark and Christina together several times; she had observed Mark and Christina kissing at a party at Ms. Ran-gel’s house; she had seen Mark at Christina’s house on multiple occasions; she had seen Mark’s belongings at Christina’s house; she had seen Devronic at Christina’s house “five or six times”; she had seen Devronic at some of the parties at Ms. Rangel’s house, and he would be “in the house, downstairs watching TV”; she and Mark had discussed his marriage, and it was her understanding that he and Eloisa were getting a divorce when she first met him; she approached Eloisa and told her that Mark and Devronic were sometimes sleeping at Christina’s house.
Erica Keammerer, Christina’s former next-door neighbor, testified as follows: she first started seeing Mark and Christina together in “mid-July, early August” 2010; she observed Mark and Christina kissing on many occasions; she had seen some of Mark’s belongings at Christina’s house; she had observed Mark and Devronic “sneaking” through a field behind Christina’s house and entering Christina’s house through the back door; she had witnessed Mark and Christina “coaching” Devronic to withhold information about Christina from Eloisa; she met Eloisa on the evening that Eloisa confronted Christina about Christina’s affair with Mark; she and Eloisa became friends thereafter.
After hearing the testimony and weighing the factors set forth in LSA-C.C. art. 134, the trial court stated:
Quite frankly, I think both of the parties have shown instances of poor judgment.
[[Image here]]
I also think that ... the parties and some of the witnesses | ismay have been less than honest or truthful to the Court and to Ms. Davis. [W]hat I’m here to do is try to sift through all of that and come up with something that I believe is in the best interest of this young ... child.
[[Image here]]
[I] have carefully considered article 134 of the Civil Code, as I’m required to do. Actually, many of the factors that are listed I felt like that it would be hard to really find more in favor of one parent over the other[,] but the factors that I found that weigh in favor of Mr. Corral would be numbers 3, 5, 6, 7 and 10. The other factors, I believe, are perhaps even between both parties. I believe it would be in the best interest of this child *801 for the father to be the domiciliary parent. I will award joint custody.
[[Image here]]
We have reviewed this record in its entirety and are convinced that Eloísa and Mark are both loving parents. However, the paramount goal in custody cases is reaching a decision which serves the best interest of the child. Based on the record before us, we find that the trial court did not abuse its discretion in concluding that awarding primary domiciliary custody to Mark was in Devronic’s best interest. The court observed the demeanor of the parties and the witnesses and expressly noted its belief that both parties and some of the witnesses had been “less than honest” with the court. However, the court clearly concluded that certain factors, namely the ability to provide the child’s necessities, permanence, moral fitness, mental health, and willingness to facilitate and encourage a continuing relationship between the child and the other party, weighed in favor of Mark.
The trial court also heard testimony with regard to the parties’ previous sharing of the physical custody of Devronic, and the occasional lack of cooperation on Eloisa’s part in permitting Mark to speak with Devronic on the telephone during her nights of physical custody. | ^Furthermore, the court was presented with evidence of both parties’ tendencies to exercise poor judgment. It is apparent that the court endeavored to fashion the best arrangement for Devronic to continue a close relationship with both parents, while ensuring his safety and well-being. Furthermore, the visitation schedule ordered by the trial court is markedly similar to the arrangement agreed upon by the parties. The trial court’s factual findings are supported by the record. We find no manifest error in the trial court’s factual findings and conclusions in this regard.
CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. Costs of the appeal are assessed to the appellant, Eloí-sa Corral.

. LSA-C.C. art. 134 provides, in pertinent part:
Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. The confrontation and subsequent detainment took place approximately two months after Mark filed for divorce.