Judgment rendered November 18, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,741-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

BILLIE COOK                                    Plaintiff-Appellee

Versus

SHARON SULLIVAN                                Defendant-Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 151,961

Honorable Michael O. Craig, Judge

* * * * *

GATTI & MERCKLE                                Counsel for Appellant
By: Emily S. Merckle

KELLY L. LONG                                  Counsel for Appellee

THE MARLER LAW FIRM, LLC
By: Hannah Marler

* * * * *

Before MOORE, GARRETT, and STEPHENS, JJ.

**STEPHENS, J.**

Sharon Sullivan appeals a judgment of the Twenty-Sixth Judicial District Court, Parish of Bossier, State of Louisiana, recognizing Billie Cook as a legal parent of Sharon's biological child and awarding the parties joint custody of the minor child. For the following reasons, the judgment of the trial court is reversed.

## FACTS AND PROCEDURAL HISTORY

This matter arises out of a custody dispute between former same-sex partners, Sharon Sullivan and Billie Cook. Sharon and Billie began a romantic relationship together in 2002. After failed attempts at artificial insemination, Sharon gave birth on December 31, 2009, to a child whom she conceived with the assistance of her co-worker and friend, David Ebarb.[1] No father was listed on the birth certificate; however, the child was given the hyphenated last name, "Cook-Sullivan." Sharon, Billie, and the child resided together until shortly after Sharon and Billie separated in February 2013. Sharon and Billie never married or entered into a domestic partnership, and Billie never formally adopted the child.[2] However, upon separation, the parties shared custody of the child—first with an every-other-week schedule, then with Billie having visitation every other weekend. That arrangement was subsequently terminated by Sharon in July 2016, leading

---

[1] Testimony at trial revealed that after several attempts of artificial insemination with David's semen, Sharon and David, unbeknownst to Billie, engaged in sexual intercourse, which ultimately led to conception of the child.

[2] Notably, the parties' romantic relationship predated *Obergefell v. Hodges,* 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), which held same-sex couples may exercise the fundamental right to marry.

Billie to file a petition to establish parentage, custody, and support on January 11, 2017.

A four-day trial on the merits began on December 13, 2017. However, after one day of testimony, the trial court appointed Dr. Shelley Visconte, Ph.D., to conduct an evaluation. The order appointing Dr. Visconte specifically tasked her with the following:

> [T]o evaluate and assist the court in the determination of the issue whether an award of sole custody to the parent Sharon Sullivan has or will result in substantial harm to the child, including in the analysis of substantial harm: 1) The alleged lack of fitness of the parent to maintain custody of her child; and 2) Whether the non-parent seeking custody is seen by the child as a parent or psychological parent such that substantial harm has or will result to the child if the child is deprived of contact with the non-parent and if the non-parent is not awarded custody.

Dr. Visconte submitted her initial report on January 10, 2019. Thereafter, on June 20, 2019, the trial court ordered Dr. Visconte to conduct supplemental evaluations and implement a visitation schedule between Billie and the child. Dr. Visconte's second and final report was submitted on October 7, 2019. Trial resumed on October 11, 2019, and concluded a week later. Following trial, the trial court issued a comprehensive written opinion and a "Considered Decree" in which it: (1) recognized Billie as the child's legal parent; (2) held that failure to reestablish the parental relationship between Billie and the child would result in substantial harm to the child; and, (3) awarded Sharon and Billie joint custody of the child, with Sharon designated as the domiciliary parent. This appeal by Sharon ensued.

## DISCUSSION

In six related assignments of error, Sharon asserts the trial court violated her constitutionally protected fundamental rights as a natural parent

2

and improperly applied the law in holding Billie was a psychological parent and entitled to joint custody. We agree.

*Overview of Relevant Testimony*

Billie testified that she was a mother to the child from the time of the child's birth until Sharon abruptly refused to allow Billie any access to the child. She and Sharon exchanged wedding bands, held themselves out as a married couple, lived together in the manner of married persons, and decided together to start a family, choosing Sharon as the first to conceive because she was the older of the two women. Billie testified that she attended Sharon's doctor appointments throughout her pregnancy and was celebrated as a mother alongside Sharon at a baby shower. According to Billie, after the child was born, the three lived together as a family, with the child referring to each party as a mother. They shared a bank account, child care expenses, and parental duties. They celebrated holidays and took vacations as a family. Billie testified that she was listed as a parent on the child's school and day care records, and even after her separation from Sharon, she continued to exercise visitation with the child as much as Sharon would allow. Billie asserted that once Sharon cut her off completely from the child, she hesitated to take legal action in hopes that Sharon would change her mind and also due to fear that Sharon would act on threats to report Billie for harassment.

Sharon testified that Billie was simply an ex-girlfriend and described her decision to conceive as a personal one made independently of Billie.[3]

---

[3] David and Billie testified that the parties together with David and his wife discussed David assisting Sharon in conceiving a child and that David and his wife agreed to do so only under the condition that the child would be raised in a two-parent household by both Billie and Sharon.

Sharon also asserted she was pressured into hyphenating the child's name, was under the influence of labor drugs when she did and immediately regretted the decision. She stated that Billie was never a mother to the child and that after their separation, only sporadically exercised visits with the child. Sharon testified that she continued to allow Billie to see the child after their separation only out of necessity due to her demanding and unconventional work schedule as a firefighter.

Dr. Visconte testified in her capacity as the court-appointed evaluator and offered testimony consistent with her previously submitted reports, which were admitted into evidence. Dr. Visconte's evaluation included interviews with the parties, separately as well as together with the child; interviews with friends and family of the parties; visits to the homes of the parties; and, review of various documents provided by the parties, including text messages, photographs, and school and financial records.

In her initial report, Dr. Visconte stated that both Billie and Sharon maintain stable employment, have safe and comfortable homes, and are equipped to provide spiritual and moral guidance to the child. She reported that both parties want what they believe to be in the child's best interest, although they disagree on what that is. Dr. Visconte explained that the term "psychological parent" refers to a person whom a child considers to be his or her parent, even though that individual may not be biologically related to the child. She identified the following factors to consider when determining if an individual should be considered a psychological parent: 1) whether the biological parent consented to and fostered the formation and establishment of a parent-like relationship with the child and non-parent; 2) whether the non-parent and child lived together in the same household; 3) whether the

non-parent assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing toward the child's support, without expectation of financial compensation; and, 4) whether the non-parent has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship that is parental in nature. After applying these factors to the information obtained during her evaluation, Dr. Visconte opined that Billie satisfied the criteria of a psychological parent, and that reunification with Billie was in the child's best interest. She recommended Billie and Sharon share joint custody, with the child residing primarily with Sharon and having visitation with Billie every other weekend. Her recommendation also contained a detailed six-month reunification plan which included, among other things, supervised visits and reunification counseling.

In her second report, Dr. Visconte conveyed the child's desire to stop the visits with Billie. The child reported feeling anxious, nervous, mad, and sad about having to attend the visitation sessions with Billie. When asked by Dr. Visconte if she had any memories of Billie, the child responded, "she's not a stranger…it's like with my old babysitters. I remember them, but I haven't seen them in a while." Dr. Visconte interpreted the child's both observed and expressed discomfort with Billie as a fear of bonding caused by the child having numerous people she had grown to love and trust eventually disappear from her life.[4] She opined that "while [the child's] fear

_____

[4] Testimony showed that in addition to Billie, the child also had a close relationship with Billie's family, particularly Billie's mother, Allyson Cook, who testified at trial. The child's contact with Allyson ceased in conjunction with her contact with Billie. Additionally, prior to being cut off from Billie, the child had frequent contact with David and his family.

to bond with others is understandable, it is also very concerning. If this fear is not addressed and corrected, it will follow her into adulthood. It will cause innumerable significant difficulties within her romantic relationships, friendships, and even working relationships."

At trial, Dr. Visconte noted that "psychological parent" was more of a legal term and she preferred to use the psychological term "attachment figure." She testified that she had reviewed a case summary by Sandi Davis, LPC, who had been retained by Sharon as a counselor to the child, and confirmed the child's reporting to Ms. Davis was consistent with the child's reporting to her. Dr. Visconte agreed with Ms. Davis's opinion that the child is a "people pleaser." She further opined that the child had developed an anxious-avoidant attachment style which sometimes causes adults to develop a borderline personality disorder, leading them to have difficulty with self-esteem, asserting themselves, and forming attachments. She stated Ms. Davis had been appropriately addressing important issues such as those with the child. Dr. Visconte testified that while it was important for the child's voice to be heard, the child's desires could not be the deciding factor in her recommendation because that would place an unfair burden on the child to resolve a situation created by adults. She reiterated the recommendation found in her report—repairing the child's family structure and having Billie in her life is in the child's best interest. Dr. Visconte testified that it is "possible" that the child could suffer substantial harm if she is not reunited with Billie—depending on whether or not the child receives good treatment. However, she further testified that Sharon is a fit parent and the child would not suffer substantial harm if Sharon were granted sole custody.

Ms. Davis testified in her capacity as the child's counselor. She stated that Sharon hired her to meet with the child out of concern as to how the pending litigation, Dr. Visconte's evaluation, and forced visits with Billie would affect her. Ms. Davis testified that the child does not want to see Billie, does not consider Billie to be her family, and has no attachment to Billie. She described the child as a "people-pleaser" who is over-compliant and over-agreeable. She explained that such behavior could possibly be harmful but that part of their therapy is working on assertiveness skills, and Ms. Davis opined that the child has improved in that area. Ms. Davis further testified that the child has a healthy relationship with Sharon, who is very loving and doting. She opined that the child should not be forced to spend time with Billie.

*Psychological Parent*

Louisiana law does not currently provide for the award of custody to a non-parent based on their status as a psychological parent; therefore, custody disputes between former LGBTQ[5] partners who co-parented the biological child of one of the partners must be decided under La. C.C. art. 133. Notably, the United States Supreme Court's landmark decision in *Obergefell v. Hodges*, 576 U.S. 644, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015), held that under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, couples of the same sex may not be deprived of the fundamental right to marry and start a family. However, the Louisiana Legislature has remained silent on the issue of children of LGBTQ relationships. Likewise, Louisiana has neither statutorily nor

---

[5] LGBTQ is a common initialism that stands for lesbian, gay, bisexual, transgender, and queer.

7

jurisprudentially recognized the *in loco parentis*, *de facto* parent, or psychological parent status in custody contests between a parent and a non-parent. Instead, the applicable law in Louisiana governing all custody contests between a parent and non-parent is found in La. C. C. art. 133.

The court in *Ferrand v. Ferrand,* 2016-7 (La. App. 5 Cir. 8/31/16), 221 So. 3d 909, *writ denied,* 2016-1903 (La. 12/16/16), 211 So. 3d 1164, identified this absence of legislative or jurisprudential guidance and provided a comprehensive discussion of the concept of a psychological parent. That case involved a custody dispute between a biological mother and a transgender father who decided to conceive and thereafter raise their twin children together as two parents in a family unit once the children were born. *Ferrand* provides a comprehensive survey of the other southern states' statutory and jurisprudential analysis of non-parent custody as it relates to the concepts of *in loco parentis*, *de facto* parent, and psychological parent. *Ferrand* also references the Louisiana Supreme Court's own discussion of the concept of psychological parent in *In re J.M.P.*, 528 So. 2d 1002 (La. 1988), in which the court was tasked with determining the child's best interest in an adoption proceeding.[6] Although *Ferrand* aptly illustrates that the concepts of *in loco parentis*, *de facto* parent, and psychological parent are widely accepted in other jurisdictions, these concepts have not been codified by the Louisiana Legislature or applied by Louisiana courts in custody determinations. Ultimately, the *Ferrand* court remanded the matter

_____

[6] Notably, in *J.M.P.,* 528 So. 2d at 1013, the court defined psychological parent as "an adult who has a psychological relationship with the child from the *child's* perspective," and stated that whether any adult becomes the psychological parent of a child is based on day-to-day interaction, companionship, and shared experiences. The *J.M.P.* court further noted the consensus within the profession of child psychology that the child-psychological parent relationship is important to the development of the child and disruption of that relationship carries significant risks. *Id.* at 1014.

for the appointment of a custody evaluator without deciding the father's status as a psychological parent or awarding custody based on such a determination. On subsequent appeal following remand, the court in *Ferrand v. Ferrand*, 2018-618 (La. App. 5 Cir. 12/6/19), 287 So. 3d 150, *writ denied*, 2020-0138 (La. 3/9/20), 291 So. 3d 216, appropriately limited its analysis to La. C.C. art. 133. In fact, that case's sole mention of the psychological parent concept appears in a mere footnote:

> As pointed out in our prior opinion in this case, although many other states have utilized the doctrines of *in loco parentis*, psychological parent, and *de facto* parent to recognize the bond formed between a child and legal non-parent, no Louisiana cases have yet adopted or applied these doctrines in a non-parent custody dispute (citation omitted).

*Ferrand*, 287 So. 3d at 159.

In the instant case, the trial court noted the lack of legal precedent in Louisiana on the issue of custody arising out of the relationship of same-sex couples as well as the legislature's failure to address the evolution of same-sex marriage and conception by same-sex couples. However, the court opined that "disputes between same-sex individuals who are living in the same household and where one of them conceives a child through assisted reproduction methods or adopts a child are clearly distinguishable from a traditional third-party dispute with a biological parent." Accordingly, instead of treating Billie as non-parent and applying Article 133, the trial court chose to formulate and apply the following test to determine whether Billie should be deemed a "legal parent":

1) The parties entered into voluntarily, jointly planned, and engaged in assisted reproduction measures resulting in conception by one of the parties;

9

2) The parties resided in the same household before and for a substantial time after the birth of the child sufficient to form a parental bond;

3) The non-biological parent engaged in full and permanent responsibilities and caretaking of a parent without expectation of compensation;

4) The non-biological parent acknowledged publicly and held themselves out to be a parent of the child;

5) The non-biological parent established a bonded and dependent relationship with the child of a parental nature;

6) The biological parent supported and fostered the bonded and dependent relationship between the child and non-biological parent.

The trial court's test closely mirrors the factors discussed by Dr. Visconte in her report, with the notable addition of the first element, specifically addressing assisted reproduction. In support of its test, the trial court's opinion discusses the doctrine of psychological/*de facto* parent and cites *Ferrand*, 221 So. 3d 909, as well as its own review of cases, including that from other "southern states." Ultimately, the trial court held Billie showed by clear and convincing evidence that she met the listed requirements to be identified as a "legal parent." Consequently, it opined Billie, as a parent, was not obligated to meet Article 133's requirement of showing substantial harm.

Sharon argues the trial court erred by applying its own test instead of Article 133's and by holding that Billie had established parentage and was thereby entitled to the same rights as a biological parent. We agree. As discussed above, Louisiana does not currently provide an avenue for non-biological parents to establish parentage based on the nature of their relationship or involvement with a child, and we are constrained to apply the law as it currently exists in Louisiana, not as we believe it should be, and not

10

as it is in other states. We commend the trial court for its detailed reasons for judgment and recognize its obvious effort to formulate a ruling that it believed to be both fair to Billie and in the best interest of the child. However, it is not the judiciary's role to fill in gaps left by the legislature. After a thorough review of the record and evidentiary testimony, it is clear the trial court abused its discretion in failing to follow Louisiana law. Billie is not a biological parent of the child, and she never legally adopted the child; therefore, the trial court erred by treating Billie as a parent and failing to properly analyze the matter under Article 133.

*Article 133 and Fundamental Rights of Parents*

It is well settled that the paramount consideration in any determination of child custody in Louisiana is the best interest of the child. La. C.C. art. 131; *Evans v. Lungrin*, 1997-0541 (La. 2/6/98), 708 So. 2d 731; *Corral v. Corral*, 47,294 (La. App. 2 Cir. 6/13/12), 93 So. 3d 793. Every child custody case is to be viewed on its own peculiar set of facts and the relationships involved. *Neathery v. Neathery*, 51,388 (La. App. 2 Cir. 2/17/17), 216 So. 3d 251. Child custody cases are reviewed under the abuse of discretion standard. *Leard v. Schenker*, 2006-1116 (La. 6/16/06), 931 So. 2d 355. The determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review absent a clear showing of abuse. *Id.*; *Smith v. Holloway*, 53,352 (La. App. 2 Cir. 1/15/20), 289 So. 3d 647.

Louisiana C. C. art. 133 governs custody disputes between a parent and a non-parent and provides:

> If an award of joint custody or of sole custody to either parent
> would result in substantial harm to the child, the court shall
> award custody to another person with whom the child has been

11

> living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.

The words "substantial harm" carry no magical connotation. "Detrimental" and "substantial harm" have been used interchangeably in the jurisprudence." *Black v. Simms*, 2008-1465 (La. App. 3 Cir. 6/10/09), 12 So. 3d 1140. In this context, "Substantial harm" includes parental unfitness, neglect, abuse, and abandonment of rights. It may also encompass other circumstances, such as a prolonged separation of the child from its natural parents causing substantial harm to the child. *Bowden v. Brown*, 48,268 (La. App. 2 Cir. 5/15/13), 114 So. 3d 1194; *Mills v. Wilkerson*, 34,694 (La. App. 2 Cir. 3/26/01), 785 So. 2d 69. This continuum for "substantial harm" is wide-ranging. *Jones v. Coleman*, 44,543 (La. App. 2 Cir. 7/15/09), 18 So. 3d 153. It is only after a finding of substantial harm under Article 133 that the best interest of the child analysis comes into play. *Black*, *supra*.

Furthermore, consideration of the best interest of the child must be balanced with the fundamental rights of the parent. When the parent competes with a non-parent of the child, the parent's right to custody is superior unless the parent is unable or unfit, having forfeited parental rights. *Jones*, *supra*. The United States Supreme Court has declared it "plain beyond the need for multiple citation" that a biological parent's right to "the companionship, care, custody, and management" of his children is a liberty interest far more important than any property right. *In re Adoption of B.G.S.,* 556 So. 2d 545, 549 (La. 1990), citing *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397, 71 L. Ed. 2d 599 (1982), and *Lassiter v. Dept. of Social Services of Durham County, N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 2160, 68 L. Ed. 2d 640 (1981). Moreover, in *Troxel v. Granville*,

12

530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the court recognized the special liberty interest of parents in the care, custody, and control of their children as one of the oldest of the fundamental liberty interests protected by the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that:

> [S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

530 U.S. at 68, 120 S. Ct. 2054.

Here, although the trial court erroneously failed to apply Article 133 and the substantial harm standard, in awarding Billie and Sharon joint custody of the minor child, it nonetheless specifically held that failure to re-establish the parental relationship between Billie and the child would result in substantial harm to the child. The trial court clearly afforded great weight to Dr. Visconte's report and correlating testimony, but also stated in its written opinion that it relied heavily on the credibility of the lay witnesses to determine Billie's status as a parent, finding Sharon's testimony to be "ultimately unreliable and completely self-serving."

Sharon argues the trial court erred by finding substantial harm and awarding Billie joint custody and that in doing so, the court infringed upon her fundamental rights as a parent. We agree. While Sharon's testimony might have contained inconsistences, her lack of credibility as a witness does not negate her rights as a parent. The testimony as a whole not only supports the finding that Sharon is a "fit parent" who loves and adequately cares for her child, but also shows the child is thriving and exceptional—bright, happy, creative, energetic, articulate, caring, intelligent, and well-

13

rounded. Admittedly, both experts opined the child is a "people pleaser," which trait might or might not lead to additional psychological conditions in the future if not addressed. However, while this trait might very well be an undesirable effect of Sharon's removal of Billie from the child's life, we do not consider such effect to rise to the level of substantial harm. Significantly, the testimony showed the child is receiving counseling that addresses her overeagerness to please and has already experienced improvement in her assertiveness. We also note the child's own adamant and consistent desire to cease contact with Billie. This is surely not a situation where the child is going to be utterly devastated by Billie's continued absence in her life. By the time the trial court issued its judgment in January 2020, aside from the mandatory sessions with Dr. Visconte, the child had not seen Billie in three and a half years. Moreover, we are not tasked with determining whether or not the child in the past suffered any emotional distress that could be considered substantial harm when she was initially cut off from Billie. Article 133 requires a finding that sole custody to Sharon *would result*—future tense—in substantial harm to the child.

Furthermore, this case is distinguishable from other cases awarding joint custody to a former same-sex partner. In *Ferrand*, *supra*, when the biological mother decided to end her relationship with the "father" of her two children, she moved out and left her two young children to live with the "non-parent," who solely cared for them as a parent while the mother chose to exercise only sporadic visitation. Thereafter, the mother initiated a malicious campaign to gain custody of the children and alienate them from the only father they had ever known. In that case, two experts agreed that for the children, who were experiencing anxiety and behavioral issues, to

14

have their father removed as a presence in their lives would be harmful to their emotional and psychological well-being. The court held the mother's conduct clearly resulted in substantial harm to the children, and significantly, clearly demonstrated that an award of sole custody to her, to the exclusion of the non-parent, would enable the mother's conduct to continue to cause substantial harm to the children. That simply is not the case here where the child by all accounts is happy, healthy, and thriving. Furthermore, aside from Sharon's perhaps questionable decision to remove Billie from the child's life, Sharon is otherwise a loving, attentive, and nurturing parent. Likewise, this case is distinguishable from *In re C.A.C.*, 2017-0108 (La. App. 4 Cir. 11/2/17), 231 So. 3d 58, in which the Fourth Circuit affirmed the trial court's holding that separation from the non-parent would cause the child to suffer substantial harm. In that case, the child had a strong emotional connection with the non-parent, who, alongside the child's biological mother, had also raised the child as a mother for the first seven years of the child's life.[7] This case, as previously discussed, is factually distinguishable, as the child does not have a bond with Billie, and she does not wish to interact with Billie in any capacity.

While Sharon's initial decision to remove Billie from the child's life may seem callous and controversial, such a determination is protected under both U.S. and Louisiana law as a fundamental liberty interest of a parent in the absence of evidence of substantial harm or neglect. As set forth above,

---

[7] Also notable in that case is the unequivocal evidence of the parties' intent to conceive and raise the child as equal co-parents, including a "Domestic Partnership Agreement" that specifically addressed child custody and a "Power of Attorney" that specifically addressed the non-parent's authority relating to the care and upbringing of the child.

there are simply no grounds in this record supporting a finding that an award of sole custody to Sharon would result in substantial harm to the child. Therefore, an analysis of the best interest of the child under La. C.C. art.134 is not warranted. The trial court erred in awarding joint custody in this case.

*Procedural Assignments of Error*

In four additional assignments of error, Sharon asserts the trial court erroneously: (1) failed to consider the biological father of the child as a necessary party to the lawsuit; (2) refused to allow the child to testify or her testimony to be proffered; (3) refused to allow Ms. Davis to testify as an expert in the field of mental health evaluations or her testimony to be proffered; and, (4) allowed Dr. Visconte to testify as an expert in the field of determining a psychological parent. In light of the above determinations, these procedural issues are moot, and discussion of these assignments of error is pretermitted.

## CONCLUSION

Fore the foregoing reasons, we reverse the trial court's judgment declaring Billie Cook a legal parent of Sharon Sullivan's minor child and awarding the parties joint custody. All costs are assessed to Billie Cook, whose claims are dismissed with prejudice.

**JUDGMENT REVERSED.**

16